OIL, CHEMICAL AND ATOMIC WORK-
ERS INTERNATIONAL UNION,
LOCAL NO. 4–16000, Plaintiff-Appel-
lant.

v.

ETHYL CORPORATION,
Defendant-Appellee.

No. 79–3471.

United States Court of Appeals,
Fifth Circuit.

Unit A

May 11, 1981.

William N. Wheat, Arlington, Tex., for plaintiff-appellant.

Joseph R. Weeks, Baker & Botts, L. Chapman Smith, Houston, Tex., for defendant-appellee.

Before GOLDBERG, GARZA and TATE, Circuit Judges.

GOLDBERG, Circuit Judge:

In its classic, the Steelworker's trilogy,[1] the Supreme Court attempted to preclude future Trojan wars between the forces of union and management by elevating the process of arbitration to an Olympian level. When a union and management have contracted to resolve their disputes through arbitration, federal courts must respect the sanctity of the arbitration process and foster its operation. In such cases, the federal court's role is limited to requiring a reluctant party to arbitrate disputes which are made subject to arbitration by the collective bargaining agreement, and to enforcing prior awards rendered by arbitrators while acting within their jurisdiction.

Both parties before us today agree that this Court must resolve the current dispute in the manner which most closely heeds the wisdom of the Steelworker's trilogy. In fact, both parties warn that the entire message of the Supreme Court's three part epic could be undermined if this Court takes

even a slight misstep and, thus, that the very efficacy of arbitration as a means of resolving industrial strife is at stake in the present suit. However, in advising us on the proper course for our Odyssey today, each party identifies the route suggested by his opponent as the path of sure destruction, while noting that only the course it suggests can insure the preservation and advancement of arbitration as a means of settling labor disputes.

Fully aware of the crucial role played by arbitration in preserving industrial peace for the past two decades and of the equanimity introduced into the labor arena by the Steelworker's trilogy, we have proceeded in our current voyage with great trepidation. We have closely analyzed both the currents which the union warned would dash the process of arbitration against precipitous rocks and the crossing tides which management claimed could only entrap arbitration in a swirling whirlpool of black water. We have charted out our own narrow course—somewhere between the union's Scylla and management's Charybdis—which we feel best fosters the process of labor arbitration and faithfully recks of the sagacity of the trilogy. This course requires that we reverse the district court's entry of a summary judgment and remand for further proceedings.

I. THE TROJAN WAR: FACTUAL BACKGROUND [2]

Defendant Ethyl Corporation ("Ethyl") operates a plant in Pasadena, Texas for the production of petrochemical products. Plaintiff Oil, Chemical and Atomic Workers International Union, Local No. 4–16000 ("Union") has been the collective bargaining agent since 1952 for most of the production and maintenance employees at Ethyl's

1. *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

2. This case presents an appeal from the grant of defendant's motion for summary judgment at the close of plaintiff's case-in-chief. D.C., 479 F.Supp. 953. Therefore, the facts outlined below are based solely on the pleadings and evidence presented during plaintiff's case, considered in the light most favorable to the plaintiff. *See Murphy v. Georgia Pacific Corporation*, 628 F.2d 862, 866 (5th Cir.1980).

Pasadena plant. At all times relevant to this case, Ethyl and the Union have been parties to a collective bargaining agreement. Two provisions of this agreement are relevant to the current controversy. The first of these clauses provides that all disputes concerning the bargaining agreement shall be submitted to arbitration. The second important provision ("Article XI") controls Ethyl's use of supervisory and salaried employees in hourly-rated jobs. Article XI [3] basically prohibits the company from placing supervisors in hourly-rated jobs, except when such placements are necessary to preserve plant safety, provide instruction to the employees, or conduct research and development.

In 1970, amidst much conflict between Ethyl and the Union over the company's use of supervisors in hourly-rated jobs, the Union resorted to the grievance and arbitration procedure in order to enforce Article XI's prohibition. The specific case chosen for arbitration at that time concerned the use of a supervisor named Johansan in the railway area of the plant to perform work ordinarily performed by hourly-rated employees. Arbitrator White heard evidence and arguments from both Ethyl and the Union and, in 1973, issued an opinion finding the company in violation of Article XI. Having found this violation of the collective bargaining agreement, Arbitrator White ordered "that hereinafter [Ethyl] desist from violations *such as that involved here.*" Record at 18. (Emphasis added). In the "Award" Section of his opinion, Arbitrator White repeated his order the Ethyl "hereaf-

ter ... desist from *like* violations." *Id.* (emphasis added).

Since the 1974 arbitration award, the Union has repeatedly filed grievances with Ethyl protesting the use of supervisors in hourly-rated positions.[4] The problems between the two parties reached a boiling point in July, 1979, when Ethyl informed the Union that it was going to put sixteen supervisors in the sodium section of the plant to perform hourly-rated work. Faced with protests from the Union, Ethyl acknowledged that this action would violate the collective bargaining agreement. Additionally, Ethyl did not deny that their actions would violate Arbitrator White's award, nor did the company claim that any of the three exemptions delineated in Article XI applied to the contemplated use of supervisors in the sodium area. Upon observing company supervisors performing hourly-rated work in the sodium area, the Union filed this suit seeking enforcement of Arbitrator White's 1973 award.[5]

The district court below ruled that "[i]n an action to enforce an arbitrator's award, a 'strict factual identity' must be shown by the plaintiff between the facts on which the arbitrator's award was based and the circumstances relied on by the plaintiff to show the noncompliance complained of." *Id.* at 63. Based solely on the evidence presented during the plaintiff's case-in-chief, the district court ruled that no "strict factual identity" existed in the present suit. Therefore, the court dismissed the plaintiff's suit[6] at the close of the plaintiff

---

3. Article XI provides:
   "Supervisory and salaried employees will not be authorized to perform work on an hourly rated job, except in the following types of situations:
   a. When it is necessary for the supervisor or foreman to act for the safety of personnel or equipment,
   b. Instruction or training of employees, and
   c. Performance of necessary experimental, special mechanical, or research and development work deemed necessary by the COMPANY."

4. Several of these grievances were resolved to the Union's satisfaction, while others were

awaiting further company action at the time the current suit was filed.

5. The Union also sought a preliminary injunction enjoining Ethyl from placing supervisors in hourly-rated jobs in the sodium area pending the conclusion of the trial. The district court denied the Union's motion for a preliminary injunction, and the Union has not raised this issue on appeal.

6. Although phrased as a dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), the district court obviously referred to the evidence presented at the hearing in dismissing this action. When a district court erroneously characterizes its action as dismissing a suit for

Union's case. The Union now appeals from the trial court's ruling.

## II. SCYLLA AND CHARYBDIS

On appeal, both parties advance extremely compelling and impeccably logical arguments in support of diametrically opposed positions. Moreover, each side gloomily and sincerely portends the dire consequences which will befall this Court's failure to arrive at the result advocated by that party.

### A. *The Union's Scylla: Rendering A Prior Arbitration Award Meaningless*

In 1970, the Union repeatedly complained to Ethyl about the company's use of supervisors in various hourly-rated jobs. The specific case submitted to arbitration that year concerned supervisor Johansan's having worked two eight hour shifts in a hourly-rated job in the railway area. The arbitration process took three years to complete and cost the Union several thousand dollars. By the time Arbitrator White's 1973 opinion was issued, the two shifts that Johansan had spent in the railway area were, at most, a faded memory.

An arbitrator's award which would have merely instructed Ethyl not to use a supervisor named Johansan in the railway yard in the manner he was used during two shifts three years earlier—an award which would have merely reminded the company of a faded memory and proceeded to order that the memory be forgotten forever—would have been a totally useless remedy for the Union. In fact, the only effect of such an award would have been to demonstrate the folly of seeking to enforce Article XI of the collective bargaining agreement: for several thousand dollars and three years' effort, the Union would merely be

provided with the opportunity to correct a wrong in the annals of Ethyl Corporation.

Arbitrator White did not issue such an award. Rather, White constructed a decree designed to stop Ethyl from violating Article XI of the bargaining agreement in the future. As noted above, White ordered the company to desist "hereinafter" from violations of the collective bargaining agreement "like" the Johansan episode and, slightly rephrased, to desist from violations "such as" the one involved in that arbitration. His award did not turn on whether the individual involved happened to be named Johansan.[7] The Union has a right to have this prior arbitration award enforced by a court and, thus, to secure the aid of the judicial strong arm in preventing Ethyl from committing a "like" violation of the collective bargaining agreement. *See New Orleans Steamship Association v. General Longshoremen Workers*, 626 F.2d 455, 468 (5th Cir. 1980); *Fontainbleau Hotel Corp. v. Hotel Employees Union Local 255*, 328 F.2d 310 (5th Cir. 1964).

Although the district court recognized its obligation to enforce the prior arbitration award, the court limited its role in this case to insuring that Ethyl did not employ a supervisor named Johansan in the railway area. This self-imposed limitation not only represented a misreading of White's award (as explained above), but it operated to convert the previous arbitration in this case —and, perhaps, the process of arbitration in general—into a futile and meaningless charade. Although the company recognized that it could no longer place supervisor Johansan in the railway area, Ethyl could still flagrantly violate Article XI of the bargaining agreement by using any other supervisor in hourly-related work in any part of

---

failure to state a claim, this Court will review the lower court's action as a grant of summary judgment. *Tuley v. Heyd*, 482 F.2d 590 (5th Cir. 1973).

7. In the arbitration opinion, White noted "All I conclude I have authority to do is find Company in violation, which I do, and order that hereafter it desist from violations such as that involved here." Record at 18. Although there was some confusion at oral argument as to the significance of the phrase "All I conclude I

have authority to do," it seems clear from our reading of the entire arbitration opinion that that phrase merely referred to Arbitrator White's decision in the previous paragraph not to order the Company to hire more railway workers (as had been requested by the Union). Record at 17. Hence, that phrase seems to have been in no way aimed at limiting either the prospectiveness or the breadth of his "desist" order.

the plant, or presumably by assigning supervisor Johansan to an hourly-rated job in any part of the plant other than the railway area. Faced with a protest from the Union, Ethyl could insist that the action presents a new grievance and must, under the arbitration clause, be resolved through the arbitration process. If the Union endures the time and expense of a new arbitration and secures a new decree against "like violations/violations of the agreement such as the one at issue," all the company need do to continue to bypass the mandate of Article XI and force the Union to institute new arbitration proceedings is change the name of the supervisor assigned to wage roll work and/or the location within the plant to which the supervisor is assigned. As the Union notes in its brief: "[The] cycle is as vicious as it is endless"; by both its viciousness and its endlessness, the cycle presents a grave threat to the survival of the process of labor arbitration.[8]

B. *Ethyl's Charybdis: Usurping the Role of the Arbitrator*

As noted above, the company's use of a supervisor in a wage roll position does not automatically violate Article XI. Ethyl is expressly authorized by that article to place supervisors in hourly-rated jobs in order to preserve plant safety, provide instruction to the employees, or conduct research and development. Therefore, the alleged current use of supervisors in wage roll positions in the sodium area cannot constitute "like" violations of the collective bargaining agreement (or violations "such as that presented" in the *Johansan* case) as condemned in Arbitrator White's decree, if the current placement of supervisors in the so-

dium area falls within one of Article XI's three exceptions. It follows that before this Court can condemn Ethyl's use of new men in the sodium area as a violation of the prior arbitration award, we would have to establish at the very least that the placements currently in controversy violated the general prohibition of Article XI and did not fall within the exemptions delineated therein.

However, this Court is not the proper body to interpret the scope of the prohibition and exemptions in Article XI and then to assess the propriety of disputed conduct in light of the mandates of that article. "The question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction [of that agreement] which was bargained for . . ." *United Steelworkers of America v. Enterprise Wheel & Car Co.,* supra, 363 U.S. at 599, 80 S.Ct. at 1362; *Waverly Mineral Products Co. v. United Steelworkers of America,* 633 F.2d 682, 684 (5th Cir. 1980); *New Orleans Steamship Association v. General Longshoremen Workers, supra,* 626 F.2d at 468. For this Court to actually assess the applicability of the prohibition and exemptions of Article XI to a new fact situation under the guise of enforcing an earlier arbitration award would be to subvert the arbitration provision in the bargaining agreement at issue in this case, and to "present a grave threat to the survival of the process of labor arbitration." *See supra* slip op. at p. 1049.

III. SETTING OUR COURSE: THE ODYSSEY TO PRESERVE ARBITRATION

Having detailed the two logical and opposing lines of analysis presented by the

---

**8.** We are mindful of the Supreme Court's general observation that "one would hardly expect an employer to continue in effect an employment practice that routinely results in adverse arbitral decisions." *Emporium Capwell Co. v. Western Addition Community Organization,* 420 U.S. 50, 67, 95 S.Ct. 977, 987, 43 L.Ed.2d 12 (1975). However, the possibility in any given case that an employer would continue or reinstitute conduct that could ultimately produce an adverse arbitral decision depends on numerous factors, including: (1) the degree of the employer's hostility toward the Union; (2) the

relative resources available to the employer and to the Union for use in arbitration proceedings; (3) the length and cost of each arbitration proceeding; (4) the possibility of a prior award being judicially enforced; and (5) the remedy that will likely result from an adverse arbitral decision. There can be little doubt, for example, that recidivism will be profitable for a large employer who is hostile toward a smaller Union, where arbitration proceedings require three years to complete and result in a penalty of an unenforceable or easily sidestepped injunction.

parties in the present suit, we are now faced with the task of devising a format for judicial intervention which will best accommodate these competing interests. We must ensure that the prior arbitration award is not sidestepped and the process of arbitration thereby rendered futile, while simultaneously guarding against actually adjudicating the merits of a grievance made subject to arbitration by the collective bargaining agreement. Hence, we must devise a standard which enables us to assess whether the company is simply committing a "like violation" of the previous award, but which stops short of forcing us to reach a decision as to whether the current use of supervisors actually violates Article XI.

Our first step must be to devise a test which ensures that the prior arbitration award is not merely being sidestepped and allows us to determine whether the company is committing a "like" violation, as condemned by Arbitrator White. It seems logical that conduct which is substantially similar to the actions condemned in the prior arbitration award must be prohibited in order to properly enforce that award. Conduct which merely differs in form from the actions which were the subject of the prior arbitration award cannot serve as an excuse for instituting new arbitration proceedings. On the other hand, actions by the company which differ materially from the previously condemned conduct and thus, are not substantially similar to that conduct, cannot constitute a "like" violation of the previous arbitration award. Therefore, if Ethyl's current actions differ materially from the previously banned conduct—and, thus, do not constitute a substantially similar or "like" violation—then the legality of such new conduct must be determined first by an arbitrator. In summary, the test of whether the current conduct is "substantially similar" to or, rephrased slightly, is "not materially different" from the conduct condemned in the previous arbitration award adequately protects the Union from the sidestepping or subversion of the prior arbitration award. The evil of Scylla is thus avoided.

Once this new test has been formulated, the need for modification and the depth of our quandary become readily apparent. It is impossible to assess whether the company's current actions differ materially or, alternatively, differ merely in form from the previously condemned conduct, without analyzing such actions in light of the prohibitions and exemptions of Article XI of the collective bargaining agreement. New conduct will materially differ from the previously condemned actions and will not constitute "substantially similar" conduct if, in fact, such new conduct does not violate Article XI. For example, a change in the name of the supervisor sent to the railway area would seem, under the current version of Article XI, to be a mere difference in form—an immaterial difference—from the previously condemned action. Such conduct would seem to be "substantially similar" to the earlier actions and would constitute a "like" violation. Thus, such conduct should be condemned by a court charged with enforcing the prior arbitration award. However, if Article XI forbade only supervisors named Johansan from working in hourly-rated jobs, then a change in the name of the supervisor would certainly constitute a material difference. Under that version of Article XI, the company's actions in sending a supervisor not named Johansan to replace Johansan in the railway area could not be considered "substantially similar" to the previously condemned action and could not constitute a "like" violation. Therefore, the test of whether this conduct is materially or substantially similar to the previous violation depends on an analysis of the permissibility of the new conduct under the relevant article of the collective bargaining agreement. However, as discussed in Section II, B, *supra*, this Court is not the proper body to assess the legality of the new conduct under the collective bargaining agreement. Therefore, although the "substantially or materially similar" test serves to evade the perils of the Union's Scylla, it must be modified to prevent our infringing on the jurisdiction of an arbitrator and succumbing to the evils of Ethyl's Charybdis.

As noted above, in assessing whether the current conduct differs materially from the previously condemned actions, a court cannot assess whether the current conduct actually constitutes a "like" violation of the collective bargaining agreement without examining the collective bargaining agreement itself; however, it is not within the court's prerogative to conduct a full scale analysis of the collective bargaining agreement. Hence, in cases seeking enforcement of a prior arbitration award that expressly forbade "like" violations of a prohibition contained in the collective bargaining agreement, we feel the test that best accommodates the interests of the Union and management is whether or not the current conduct is arguably permissible under the relevant provision collective bargaining agreement. If, based on the evidence at trial, it is not even arguable that the current facts fall outside the prohibition or within an exemption of the article in question, then a court can safely conclude that the defendant's conduct does not differ materially from the previously condemned actions and thus, that the defendant is committing a "like" violation of the bargaining agreement, *in violation of the prior arbitration award*. However, if the evidence indicates that a defendant has an arguable position in claiming that the current action does not violate the article in question— that the current conduct is materially different from the previously condemned conduct—then the defendant is not clearly sidestepping the prior arbitration award. In such a case, the question whether the disputed conduct actually violates the collective bargaining agreement (although a court has found it is at least arguable that it does not) should then be deferred to an arbitrator.

Having devised the test to be employed, we are faced with the problem of assigning the respective burdens to be carried by each party in attempting to meet the announced standard. Of course, in an action to enforce a prior arbitration award, the plaintiff has the ultimate burden of proving the existence of a violation of the previous award. Therefore, under the test announced above, the plaintiff bears the ultimate burden of proving that the defendant's current action is not even arguably permissible under the relevant provision of the bargaining agreement, and, therefore, does not, even arguably, differ materially from the previously condemned conduct.

However, many clauses in a collective bargaining agreement—like Article XI at issue in the current suit—contain a general prohibition and several exceptions. Carrying the analysis of the previous paragraph one step further, the plaintiff thus has the ultimate burden of proving that the disputed conduct falls, beyond argument, within the prohibition and outside the exceptions of the article. However, it would be impractical and, perhaps, impossible for the plaintiff to prove, beyond argument, that the defendant's action falls within the general prohibition of the article in controversy and outside of every exception delineated in that provision. Therefore, in cases seeking enforcement of a prior arbitration award forbidding "like" violations of an article which contains a general prohibition and several exceptions, it is necessary to divide the plaintiff's ultimate burden of proof into intermediate evidentiary burdens.[9]

The burden initially lies with the plaintiff to establish that the defendant's conduct falls within the same prohibition relied on in the earlier arbitration award. If the disputed conduct does not "clearly" or "inarguably" fall within the article's prohibition, then the defendant is not clearly sidestepping the prior arbitration award. In such a case, the question whether the disputed conduct actually violates the bargaining agreement (although a court has

---

**9.** The use of intermediate evidentiary burdens to foster the fair and expeditious resolution of a case in which the plaintiff is charged with the task of proving the inapplicability of numerous possible justifications—of proving the negative—is by no means without precedent. For example, the Supreme Court, has recently detailed the process of dividing evidentiary burdens in employment discrimination cases. *Texas Department of Community Affairs v. Burdine,* —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1980).

found that it doesn't "clearly" or "inarguably" violate the agreement) must be decided by an arbitrator. The complaint should be dismissed and the plaintiff should be afforded the opportunity to institute new arbitration proceedings.

■ If the plaintiff establishes that the current conduct inarguably falls within the prohibition that was the subject of the previous arbitration award, the burden shifts to the defendant to articulate, through the presentation of evidence [10] the reasons why the disputed conduct at least arguably falls within an express exception in, or is otherwise exempted from satisfying the mandates of,[11] the relevant article of the bargaining agreement. Placing the burden of production on the defendant to show that the disputed conduct arguably falls within an exception to the prohibition "serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate" that the exception relied on is, beyond argument, inapplicable. *Burdine, supra,* —— U.S. at ——, 101 S.Ct. at 1094. If the defendant is unable to articulate, through evidence, legitimate reasons why the disputed conduct is even arguably exempt from the prohibition, then the court can conclude that the present conduct is substantially or materially similar to the company's previous actions and thereby constitutes a "like" violation of the bargaining agreement as condemned in the prior arbitration award. At that point, the court

may issue an order fashioning an appropriate remedy to enforce the prior arbitration award.

■ However, the burden of persuading the court that the current conduct constitutes a violation of the prior arbitration award always remains with the plaintiff. Therefore, if the defendant succeeds in presenting evidence indicating that the disputed conduct arguably falls within an exception or is arguably otherwise exempt, the plaintiff must prove, beyond argument, that the cited exception is a mere pretext or is, again beyond argument, otherwise inapplicable to the present situation.[12] If the plaintiff fails to prove, beyond argument, that an articulated exception or exemption does not apply, then the defendant is not clearly sidestepping the prior arbitration award; the question whether the exemption or exception cited by the defendant *actually* applies to the disputed conduct (although the court found that the exception was at least colorable) should then be deferred to an arbitrator. The complaint should be dismissed and the plaintiff should be afforded the opportunity to institute new arbitration proceedings. However, if the plaintiff does prove, beyond argument, that the disputed conduct falls within the prohibition and is not even arguably excused by any articulated exception or exemption, then the court can conclude that the present conduct constitutes a "like" violation, as condemned in the bargaining award. At that point, the court may issue an order and shape a remedy to enforce the prior arbitration award.

---

10. As the Supreme Court noted in *Texas Department of Community Affairs v. Burdine, supra,* —— U.S. at ——, 101 S.Ct. at 1094 n.9, "An articulation not admitted into evidence will not suffice. The defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel."

11. Although the defendant's conduct may violate the express prohibition and fall outside the express exceptions delineated within a clause, the case could still be submitted for arbitration. Arbitration would be proper if the court finds that it is arguable that an arbitrator would find an implied exemption, articulated by the defendant through the presentation of evidence,

to be both cognizable under the bargaining agreement and sufficient to excuse the conduct.

12. For example, in the current case, Ethyl might introduce testimony indicating that supervisors were sent to provide instruction to the men. In that case, the Union could still prevail by proving that this articulated reason was a mere pretext. The Union could introduce evidence, for example, proving that the supervisors in question never attempted to provide instruction. Similarly, evidence that the company admitted it was merely seeking to violate the bargaining agreement and prior arbitration award would tend to prove pretext.

As noted above, if the plaintiff fails to satisfy his burden at any point leading to the dismissal of his complaint, the plaintiff may seek further relief by instituting new arbitration proceedings. The arbitrator may then find that the disputed conduct does not constitute a violation of the collective bargaining agreement and rule for the defendant. Alternatively, the arbitrator may find a violation of the agreement and order the company to cease and desist its conduct. In the latter case, the arbitrator in his decree should be able to order appropriate action to repair the violation. Thus, if the arbitrator decides that this violation of the bargaining agreement is, in fact, also a violation of the prior arbitration award, and/or that there is a possibility that the company will repeat the violation, the arbitrator should be able to shape an appropriate remedy aimed at preventing and repairing the damage caused by the defendant's recidivism.

Applying the general standards and the three part test delineated above to the present case, our inquiry must focus on whether Ethyl's recent placement of men in the sodium area is "substantially" or "materially" similar to the previous use of Johansan in the railway area, as to constitute a "like" violation of the bargaining agreement. As explained above, this inquiry must be pursued by determining whether the use of men in the sodium area is arguably permissible under Article XI. The Union, as plaintiff, carries the ultimate burden of proving that Ethyl's current action is not even arguably permissible under that action. However, because Article XI contains a specific prohibition and several exceptions, the Union's burden should be divided into the intermediate evidentiary burdens explained above.

The Union is initially charged with the responsibility of proving, beyond argument, that at least one of the men assigned to the sodium area is a "supervisor" or "salaried employee" and that the supervisor(s) is performing an "hourly-rated job." If the Union fails to satisfy this burden, the complaint should be dismissed and the Union will be forced to institute new arbitration proceedings. If the Union does meet this burden, the burden shifts to Ethyl to present evidence indicating that the current placements of supervisors in hourly-rated jobs fell within an exception under Article XI—i. e. that such action was necessary to insure the safety of equipment or personnel, to instruct or train employees, or to perform necessary experimental, special mechanical or research and development work.[13] If Ethyl cannot meet this burden, the Union will be entitled to the enforcement of the prior arbitration award. However, if Ethyl can, through the introduction of evidence, articulate a reason why the disputed conduct fell within an exception to Article XI, the Union would be required to persuade the court, beyond argument, that the cited exception was merely a pretext for the recent use of supervisors in the sodium area. If the Union satisfies this last burden, the court should enforce the prior arbitration award; if not, the complaint should be dismissed and the Union should be forced to seek further relief through arbitration.[14]

## IV. THE CYCLOPS: THE LEGEND OF HONEYWELL

In the case at bar, the district court concluded that defendant's motion for summary judgment should be granted based on its reading of the Seventh Circuit's opinion in *United Electrical Radio and Machine Workers v. Honeywell, Inc.*, 522 F.2d 1221 (7th Cir. 1975). The lower court read *Honeywell* as requiring the present action to be dismissed unless the Union could demonstrate a "strict factual identity" between the facts of the current dispute and those on which

---

13. Alternatively, Ethyl could present evidence to indicate that it is arguable that an arbitrator would find an implied exception to be both cognizable under the bargaining agreement and sufficient to justify the use of supervisors in the sodium area.

14. If the complaint is dismissed and the Union institutes new arbitration proceedings, then the options detailed on slip op. p. 1053 *supra* would control the course of such proceedings.

the prior arbitration award was based. We disagree with the district court's interpretation of *Honeywell* and do not find that opinion to be inconsistent with either the tests established in, or the supporting analysis provided by, our opinion today.

The plaintiff in *Honeywell* advanced the same argument relied on by the Union in the present case:

The Union argues that if the court were to grant the relief which it seeks here [of enforcing the prior arbitration award] the court would not be repudiating the federal policy favoring arbitration, but rather that it would be reaffirming and effectuating that policy. It is the Union's contention that where an employer wilfully and persistently refuses to conform its behavior to the clear dictates of a prior arbitration award, the Union should not be limited to arbitrating each violation of that award in a separate grievance proceeding where its relief is limited to the payment of damages although it is suffering irreparable harm.

522 F.2d at 1221; *see* slip op. at page 1049 *supra.* Under circumstances similar to the facts of the present case, the Seventh Circuit might well have reached a result similar to the one we announce today: "We agree that permitting courts to intervene in such a circumstance might, in fact, further the national arbitration policy." *Id.* However, the facts presented to the *Honeywell* court differed significantly from those forming the basis of the present suit.

The plaintiff in *Honeywell* failed to introduce any prior arbitration decision into evidence, or even to inform the Court of the facts giving rise to any prior arbitration decree. *Id.* at 1227. Similarly, the *Honeywell* Court was never informed of the wording used by an arbitrator in issuing a prior award, or of the scope of any previous arbitration decree. These omissions—not present in the current suit—proved fatal to the plaintiff Union's case in *Honeywell.* The Seventh Circuit could not assess the similarity between the facts involved in earlier grievances and those underlying the dispute actually before that Court.[15] Moreover, there was no evidence before the Seventh Circuit that any prior arbitration award either contained a prospective prohibition or forbade "like violations." *See id.* at 1226. Hence, the Seventh Circuit had little choice but to conclude: "The Union here, however, has not alleged facts sufficient to entitle it to be relieved of its duty to arbitrate." *Id.* at 1228.

To the extent that language in the *Honeywell* opinion can be read—or was meant by that Court to be read—to require in all cases the existence of a "strict factual identity" between the facts forming the basis of a prior arbitration award and the facts of a subsequent grievance before the prior award may be judicially enforced, it must be rejected. First, the term "strict factual identity" so completely defies being operationally defined as to be devoid of meaning. Because of the necessary passage of time between the conduct condemned in a prior arbitration award and the action leading to the institution of the enforcement suit at issue, it is impossible for "strict factual identity" in its purest sense ever to exist. Therefore, if the use of supervisor Johansan in the railway area in 1973 can be said to be "strictly factually identical" to the use of supervisor Johansan in the railway area in 1970, why would not the use of another supervisor in the railway area in 1973 plus the assignment of supervisor Johansan to fill the position vacated by the other supervisor also constitute "strict factual identity?" Would not the same be true if supervisor Johansan was used in 1973 to perform the same hourly-rated task in the section adjacent to the railway area? Or if Johanson was used to perform an almost identical task in a nearby area? The slip-

---

15. The Seventh Circuit expressly noted that the plaintiff in *Honeywell* failed to allege that "the factual basis of the arbitration awards in its favor *is substantially identical* to the facts in other grievances not yet presented for arbitration." *Id.* at 1226 (emphasis added). The Seventh Circuit's use of the "substantial identity" test casts doubt on the district court's reading of *Honeywell* as requiring "strict factual identity."

periness of the "strict factual identity" slope serves to discredit the choice of that slope as the proper path on which to proceed.

Second, reliance on the term "strict factual identity" to identify those grievances which need not be submitted to arbitration has no greater appeal in logic than the use of such terms as "semi-strict factual identity," "semi-loose factual identity," or "loose factual identity." None of the these terms serves to identify the set of grievances which logically should be judicially enforced from those which should be resolved by arbitration.

As noted at length above, we feel the expression which best characterizes the necessary relationship between the previously condemned conduct and the current actions and which is both capable of being instrumentally defined and supported by logic is "material factual identity." "Material factual identity" exists when there is no difference between the current facts and those giving rise to the prior arbitration award which, when analyzed in light of the mandates of the collective bargaining agreement, would justify an arbitrator's reaching a different conclusion in each of the two cases. If it is beyond argument [16] that there is no material difference between the current facts and the facts on which the prior arbitration award was based (*i. e.*, if there is, beyond argument, material factual identity), then logically, the current dispute would constitute a "like" violation of the bargaining agreement, as condemned by the previous arbitration award. There would then be no reason to submit the current dispute to arbitration. Returning to the example relied on above, since the name of the supervisor placed in hourly-rated jobs is in no way relevant to the mandates of ·Article XI, then the mere fact that the

company in 1973 exchanges the assignments of supervisor Johansan with those of another supervisor should not prevent the enforcement of Arbitrator White's 1973 decree forbidding "like" violations of the bargaining agreement. Under the test relied on by the district court in this suit, the exchange of Johansan for another supervisor would break the "strict factual identity" and force the court to dismiss the other supervisor's case for arbitration; under the test announced today, the mere change in the name of the supervisor in question would not prevent the court from finding, beyond argument, the existence of "material factual identity" and from enforcing the prior arbitration award.[17]

## V. HOME AT LAST: THE RETURN TO ITHACA

█ By relying on the "strict factual identity" test, the district court improperly granted defendant Ethyl's motion for summary judgment. We have closely heeded the warnings of peril advanced by both parties in this suit, and, by our Odyssey today, have charted out a new course to be followed by the district court on remand. We feel this new course best preserves the integrity of the labor arbitration process and fosters the time-tested wisdom of the Supreme Court's Steelworker's trilogy.

Accordingly, the district court's judgment in this case is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

### REVERSED AND REMANDED.

---

16. *See supra* slip op. at p. 1051.

17. We do not feel that our decision today in any way contradicts this Court's opinion in *New Orleans Steamship Association v. General Longshoremen Workers*, 626 F.2d 455 (5th Cir. 1980). In *New Orleans Steamship*, this Court reversed a decision of the district court which had expanded the terms of a carefully limited arbitration award under the guise of enforcing it. *See id.* at 468. Our opinion today merely seeks to delineate a test by which a court can identify whether the relief sought in a given suit would constitute expanding or enforcing a prior arbitration award.