**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NO. 199, Plaintiff-Appellant,**

v.

**UNITED TELEPHONE COMPANY OF FLORIDA, Defendant-Appellee.**

No. 83–3068.

United States Court of Appeals, Eleventh Circuit.

Aug. 20, 1984.

---

**13.** *See* Fed.Reg. 13,804.

Thomas J. Pilacek, Orlando, Fla., for plaintiff-appellant.

George K. McPherson, Jr., David A. Rammelkamp, Atlanta, Ga., for defendant-appellee.

Before RONEY and JOHNSON, Circuit Judges, and MORGAN, Senior Circuit Judge.

JOHNSON, Circuit Judge:

The International Brotherhood of Electrical Workers, Local Union No. 199 ("the Union") challenges an arbitrator's construction of a collective bargaining agreement entered into by the Union and the United Telephone Company of Florida ("United" or "the Company"). Section 3.01–D of the agreement involves the distribution of overtime and provides:

All overtime worked on emergency standby, emergency call-out and all other work periods other than those provided in Section 3.01 A and B of this Article shall be rotated, as far as possible, among the employees who have completed the probationary period, qualified to perform the required work if immediately available in the work classification within a group reporting to a foreman (Overtime Group).

The purpose of the section is to distribute covered overtime equally among employees within a work group. Section 3.01–D(2) proves that

[w]hen overtime is required an attempt will be made to contact the man having the least amount of overtime credits on the roster. In order to contact the employee on a call-out the Company will place a telephone call to the number most recently supplied in writing to the supervisor and allow reasonable time for an answer.

Section 1.05 defines the term "call out," used in section 3.01–D(2), as "notification to report for work immediately, outside of regularly scheduled working hours." The arbitrator decided the question whether section 3.01–D requires the Company to rotate all overtime or only overtime that is unscheduled, or "call out" overtime.

Beginning on August 7, 1979, the Company assigned a cable splicer, Russel Lord, to work with the Florida Department of Transportation to locate and mark buried telephone cables near a railroad crossing during the installation of railroad crossing signs. The Department of Transportation decided that on August 8 and 9 it would begin work at the crossing at 6:30 a.m., an hour and one-half earlier than Lord's normal 8:00 a.m. starting time. Lord earned three hours of pre-shift overtime during those two days. Larry Ireland, a cable splicer who worked the same shift as Lord, filed a grievance claiming that the Company violated section 3.01–D by offering the overtime to Lord rather than to him. The grievance was eventually presented to arbitrator Donald P. Crane. On January 13, 1982, Crane issued his award in favor of United.

Crane based the award on a distinction he drew between two types of overtime:

Logically speaking, plant employees are regularly called out to restore or maintain service. Thus, they are subject to call-out or stand-by which involves an immediate response. Overtime under these circumstances is unscheduled in nature. Planned (or scheduled) overtime is anticipated or known in advance and does

not require an individual to report immediately.

Crane determined that section 3.01–D applies only to "unscheduled" overtime, and that the contract does not require the Company to rotate "scheduled" overtime such as the pre-shift overtime it had assigned to Lord.

Shortly after Arbitrator Crane handed down his award, Gregory Ezell, United's personnel manager, wrote Gerald DeWolf, the business manager for the local Union, and identified twenty-one pending grievances,[1] "each of which have the issue of whether or not Section 3.01–D applies to scheduled overtime." Ezell stated that the Company's position was that the Crane award had settled this issue, and that in light of section 16.03 of the agreement, which provides that the decision of the arbitrator shall be "final and binding," the Company would "notify any arbitrator now selected to hear any of these grievances that the arbitration is cancelled."

On March 25, 1982, the Union filed this action pursuant to section 301(a) of the National Labor Relations Act ("the Act"), 29 U.S.C.A. § 185(a). Count I of the complaint sought reversal of the arbitrator's decision on the merits and a holding that section 3.01–D applies to all overtime, scheduled and unscheduled. Count II sought an order requiring the Company to submit to arbitration on the twenty-one other grievances. United filed a counterclaim seeking enforcement of the arbitration award and requesting that the court hold that "the issue of whether section 3.01–D ... applies to scheduled overtime work is foreclosed from further arbitral consideration, thereby depriving any arbitrator of jurisdiction to consider such issue." The counterclaim requested that, in future arbitrations in which the Union attempts to raise the issue, the Company be permitted to "produce a copy of said Declaratory Judgment which deprives said arbitrator of any jurisdiction to consider or

rule upon said issue." United also submitted the affidavit of its personnel manager, which listed each of the twenty-one pending grievances, described the issues involved, and asserted that all turned on the question whether scheduled overtime was subject to the rotation requirement of section 3.01–D.

The district court granted United's motion for summary judgment. The court dismissed both counts of the plaintiff's complaint and entered a declaratory judgment holding that the arbitrator's interpretation of the contract constituted binding precedent for future arbitrators, who, the judgment declares, are deprived of jurisdiction to consider the issue of section 3.01–D's application. The Union appeals from this final judgment, claiming that the arbitrator's award exceeded his authority under the contract and that the district court's declaratory judgment exceeded its power under the Act.

### A. *Arbitrator Crane's Interpretation of the Contract*

Arbitrator Crane approached the problem of interpreting section 3.01–D in several ways. First, he concluded that, although the section "appears to require Management to rotate all overtime," it contains latent ambiguity. Crane reasoned that "this provision becomes unclear because of the phrase 'and all other work periods other than those provided in Section 3.01–A and B of this Article ....'" Sections 3.01–A and B merely establish the hours of normal tours and do not deal with overtime.... [T]he phrase creates ambiguity." Crane also found significant that section 3.01–D requires rotation of work among employees "qualified to perform the required work *if immediately available*"; he noted that this limitation would be unnecessary if scheduled overtime, for which employees would not have to be "immediately available," was required to be rotated. The

---

**1.** These grievances are designated in the affidavit of Gregory Ezell as follows: PG 205–79, AP 208–79, AP 209–79, FM 49–80, FM 60–80, FM 54–80, N 37–80, AP 34–81, FM 7–81, FM 11–81, FM 38–81, FM 54–81, N 11–81, N 15–81, N 16–81, N 17–81, N 18–81, N 20–81, N 24–81, N 27–81, and N 40–81.

arbitrator read section 3.01–D in conjunction with 3.01–D(2), which establishes the rotation procedure. Section 3.01–D(2) mentions "call out," which is unscheduled overtime. Crane also placed importance on an award issued by Arbitrator Rimer several years earlier, which, although dealing with a different factual situation, found that "Section 3.01–D excludes these scheduled assignments from the rotation requirements." Crane stated that "Arbitrator Rimer's interpretation is a binding part of the Agreement and I am obliged to accept it especially since it has withstood the test of judicial review."[2] Arbitrator Crane emphasized that subsequent to Rimer's award, the parties had renegotiated the contract, and the Union had been unable to rewrite section 3.01–D. Crane further supported his interpretation by noting that United's "long-standing past practice" was not to rotate scheduled overtime. Finally, Crane concluded that "[t]he Company's practice of not rotating scheduled overtime also appears to be in the interest of efficiency and sound operation." He pointed out that to have Ireland work the first hour and one-half of the job, then turn it over to Lord, and commute, on company time, to his normal work station would be highly inefficient. Crane concluded that "[g]iven the language of the Agreement, Arbitrator Rimer's interpretation of the language and long-standing and consistent past practice in applying the language, I conclude that the Company's actions did not violate the Agreement."

The scope of judicial review of labor arbitration decisions is "exceedingly narrow." *Loveless v. Eastern Air Lines, Inc.*, 681 F.2d 1272, 1275 (11th Cir.1982). Severely limiting judicial review of arbitral awards advances the strong federal policy favoring private resolution of disputes over the interpretation of collective bargaining agreements. The Supreme Court highlighted this policy and several of its corollaries in a series of cases known as the "Steelworkers Trilogy." *United Steelworkers of Ameri-*

*ca v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). These cases emphasize the principle that private arbitration of labor disputes plays a vital role in achieving the Act's primary goal of promoting industrial peace. *Warrior & Gulf*, 363 U.S. at 578, 80 S.Ct. at 1350. "To the extent that the courts intrude into this scheme, they detract both from the central role of the arbitrator and the palliative effect of the arbitration process." *Loveless*, 681 F.2d at 1275; *see also Enterprise Wheel*, 363 U.S. at 598–99, 80 S.Ct. at 1361–62. Narrow judicial review is also a product of arbitration's contractual basis. "It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Enterprise Wheel*, 363 U.S. at 599, 80 S.Ct. at 1362. Instead, "the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made." *Warrior & Gulf*, 363 U.S. at 582, 80 S.Ct. at 1353. Nevertheless, even this limited scope of review implies an additional principle: that the contract itself imposes limits on the arbitrator's power.

[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words

---

**2.** The Union had filed a section 301 action in the District Court for the Middle District of Florida seeking to vacate the Rimer award. In October 1978, that court, in an unpublished order, entered a judgment in favor of United and enforcing the award.

manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Enterprise Wheel*, 363 U.S. at 597, 80 S.Ct. at 1361.

The Union claims that the Crane award violates the last of these principles because it does not draw "its essence from the collective bargaining agreement." The Union urges that the plain and unambiguous language of the contract applies the rotation requirement to all overtime work. It contends that the concept of "unscheduled overtime," on which the arbitrator relied in his award, does not exist in the collective bargaining agreement. Finally, the Union points to the agreement's "no modification" clause,[3] which, it claims, limits the power of the arbitrator. The Union argues that Arbitrator Crane violated this limitation by ignoring the plain language of the agreement and by adding to the agreement the concept of "unscheduled" overtime.

 We find merit in the Union's contention that the language of section 3.01–D suggests that all overtime must be rotated. That section requires rotation for "[a]ll overtime worked on emergency standby, emergency call-out and all other work periods other than those provided in Section 3.01A and B." This appears to include all work outside normal tours of duty.[4] Nevertheless, we agree with the arbitrator that the "immediately available" language of section 3.01–D creates ambiguity about the coverage of the section. Even if we were to conclude that section 3.01–D is not ambiguous on its face, we would not be required to overturn the award. In *Loveless v. Eastern Air Lines, Inc., supra*, this Court held that even where an arbitrator's award is contrary to the plain, unambiguous language of the collective bargaining agreement, the award may still "draw its essence" from the agreement. In *Loveless* the parties disagreed whether a clause that provided supplemental benefits to specified employees extended those benefits to the plaintiffs. A literal reading of the collective bargaining agreement would have entitled the plaintiffs to benefits, but the arbitrators, relying on the past practice of the parties and the history of the bargaining that led to the agreement, concluded that the intent of the parties had not been to extend benefits to the plaintiffs. This Court upheld the arbitrators' award.

> [A]bsent some express restriction upon the arbitrator's authority, the arbitrator is not limited to the bare words of the agreement and common law rules for the interpretation of private contracts.... An arbitrator does not violate his duty to draw the essence of his award from the letter or purpose of the collective bargaining agreement when he relies upon any of several aids to construe the intent of the parties in addition to the express terms of the contract. These extrinsic aids include the past practice of the parties, ... bargaining history, ... and industrial efficiency considerations "insofar as the collective bargaining agreement permits".... The arbitrators relied upon probative evidence of bargaining history to determine that the parties did not intend that employees in appellees' position would receive enhanced retirement benefits.

681 F.2d at 1280. As the Court held in *Loveless*, an arbitrator's award that appears contrary to the express terms of the agreement may nevertheless be valid if it is premised upon reliable evidence of the parties' intent.

---

**3.** Section 16.01–B(2) of the collective bargaining agreement provides: "No arbitrator shall have the jurisdiction or authority to add to, take from, nullify, or modify any of the terms of this Agreement or impair any of the rights reserved to management by the terms hereof, either directly or indirectly under the guise of interpretation."

**4.** Sections 3.01–A and B describe regular non-overtime work tours. Thus the language "and all other work periods other than those provided in Section 3.01A and B" would appear to mean "and all other overtime." Rather than creating ambiguity, as the arbitrator suggested, this provision appears to support the Union's position. As we note in text, however, the "immediately available" language of section 3.01–D does create ambiguity.

Arbitrator Crane's award meets the *Loveless* standard. The evidence on which Crane relied was similar to the evidence available to the *Loveless* arbitrators: past practice in awarding overtime assignments, industrial efficiency, and bargaining history. The Union urges, however, that this case is distinct from *Loveless* because here the contract contains a "no modification" clause, which constitutes an "express restriction upon the arbitrator's authority." There are two conflicting lines of authority on the effect that such standard "no modification" clauses have on the scope of judicial review or arbitral awards. The first, represented by cases such as *Torrington Co. v. Metal Products Workers, Union Local 1645*, 362 F.2d 677, 680 (2d Cir.1966), holds that such a clause significantly restricts the arbitrator's authority to go beyond the express terms of the contract. The other, represented by *Holly Sugar Corp. v. Distillery Workers Int'l. Union*, 412 F.2d 899, 904–05 (9th Cir.1969), holds that boilerplate "no modification" clauses do not limit to any significant degree the arbitrator's authority. The *Holly Sugar* court quoted the dissent in *Torrington* to say that

the arbitrator looked to the prior practice, the conduct of the negotiations for the new contract and the agreement reached at the bargaining table to reach his conclusion.... From all of this, I conclude that the arbitrator's award "draws its essence from the collective bargaining agreement" and his words do not "manifest an infidelity to this obligation."

*Id.* at 905. As the *Loveless* Court stated, "[o]ur binding precedent from the former fifth circuit ... has read the *Torrington* decision narrowly and has not been apt to view the standard 'no modification clause' as a tremendous constraint upon the authority of the arbitrator." 681 F.2d at 1277 n. 10, *citing United Steelworkers v. U.S. Gypsum Co.*, 492 F.2d 713, 731 (5th Cir.

1974) (citing *Holly Sugar* as the correct statement of the law); *Dallas Typographical Union v. A.H. Belo Corp.*, 372 F.2d 577, 583 (5th Cir.1967) (*Torrington* should be "carefully confined lest, under the guise of the arbitrator not having 'authority' to arrive at his ill founded conclusions of law or fact, or both, the reviewing-enforcing court takes over the arbitrator's function."). As we explained in *Loveless:*

If the collective bargaining agreement in this case did contain a "no modification clause," our result would not necessarily be different. An arbitrator may be able to discern a latent ambiguity in a contract based on his examination of past practice or bargaining history even though no ambiguity appears on the face of the contract. The arbitrator might then be able to resolve the latent ambiguity by resort to permissible sources of extrinsic evidence.

681 F.2d at 1278–79 n. 14. Arbitrator Crane resorted to these same sources of interpretation to find and resolve an ambiguity. Moreover, the case for upholding his award is stronger than in *Loveless* because section 3.01–D's use of the phrase "immediately available" created ambiguity on the face of the agreement. Consequently the Crane award "draws its essence from the collective bargaining agreement," and the district court was correct in upholding it.[5]

**B.** *The Order to Arbitrate and the Precedential Effect of the Crane Award*

In the second count of its complaint, the Union requested that the district court order the Company to arbitrate the twenty-one grievances that Ezell had refused to take to arbitration. The district court dismissed the complaint. In its counterclaim, the Company sought a declaratory judgment stating that it was not required to arbitrate the twenty-one grievances and holding that future arbitrators would have no jurisdiction to rule upon the issue of

**5.** Nor is there merit in the Union's contention that the arbitrator violated the "no modification" clause by inserting into the agreement the concept of scheduled overtime. "Scheduled overtime" was merely the arbitrator's shorthand for any overtime that is not "emergency standby or call-out"—terms that are found in the agreement.

Section 3.01–D's application. The district court held for United on the counterclaim and entered an order stating that

> the issue of whether Section 3.01(D) of the collective bargaining agreement applies to scheduled overtime work is foreclosed from further arbitral consideration. Any arbitrator seeking to consider such issue is without jurisdiction to do so, at least during the term of the current collective bargaining agreement and until such time as the language of Section 3.01(D) is materially modified. Should the union attempt to rearbitrate the issue of the applicability of Section 3.01(D) to scheduled overtime work, United may introduce a copy of this Final Summary Judgment with Entry of Declaratory Relief into evidence before the arbitrator and the arbitrator will then be deprived of jurisdiction to consider that issue.

The Union challenges both the district court's refusal to order arbitration of the twenty-one grievances and its declaratory judgment holding the Crane award binding precedent in further arbitrations and denying jurisdiction to future arbitrators to consider the issue.[6]

United defends the district court's resolution of these issues on two basic grounds. The first is that such an order was required to protect the finality and the binding nature of the Crane award. The Company points out that the Union had indicated its intention to rearbitrate the issue of section 3.01–D's application in grievances that are similar to this one. The Company urges that in order for this Court to protect the "dignity and finality" of the Crane award it must affirm the district court's order requiring all future arbitrators to consider themselves bound by Arbitrator Crane's in-

terpretation of the collective bargaining agreement. Second, United claims that section 16.03–C of the contract[7] constitutes an explicit agreement that arbitral awards will have prospective or binding precedential effect. Because we find the district court's declaratory judgment to be in conflict with federal labor policy and this Court's precedent and because we find United's arguments unpersuasive, we reverse the district court's disposition of the Union's second claim and United's counterclaim.

As the Supreme Court established almost a quarter century ago in the Steelworker's Trilogy, Federal labor policy strongly favors private settlement of disputes over the meaning of collective bargaining agreements. This policy is advanced by minimizing judicial interference in the arbitral process. *See Enterprise Wheel,* 363 U.S. at 598–99, 80 S.Ct. at 1361–62; *Loveless,* 681 F.2d 1275. Consequently, the role of the courts in reviewing arbitral awards is severely limited:

> The Congress, however, has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration of any dispute which he has not agreed so to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the

---

**6.** At oral argument before this Court, the Company conceded that the district court's restriction of the jurisdiction of future arbitrators was erroneous. The Company contended that the district court's use of the term "jurisdiction" (although suggested by the Company's counterclaim) was unfortunate and that the court intended merely to establish the Crane award as a binding precedent for future arbitrations. Although our discussion focuses on the district court's holding on the precedent issue, it follows

that any restriction of future arbitrators' jurisdiction would be similarly erroneous. *See* note 8, *infra.*

**7.** Section 16.03–C provides: "The decision of the arbitrator when rendered upon a matter within his authority and within the scope of matters subject to arbitration ... shall be final and binding upon the parties."

award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

*Warrior & Gulf,* 363 U.S. at 582–83, 80 S.Ct. at 1352–53.

■ This severely circumscribed judicial role does not allow courts to impose rules of precedent or to deprive arbitrators of jurisdiction to decide matters of contract interpretation.[8] On the contrary, the federal policy of judicial non-interference and preservation of the dignity of the arbitral process requires that the development and imposition of a binding "law of the contract" be achieved by the arbitral system itself, not the courts. Our own binding precedent makes the division of responsibility between judicial and private dispute resolution quite clear:

> Arbitration is a dispute-settlement procedure that is a part of the collective bargaining process.... It is not a judicial forum. Whether there is a "law of the contract" between the parties once an arbitrator decides an issue and what effect, if any, is to be given precedent are not primarily, if at all, questions for judicial resolution.... Whether the [arbitral] award can be given an effect akin to res judicata or stare decisis with regard to future disputes that may arise between the parties, neither the district court nor this court should decide. If the

parties do not agree, that issue itself is a proper subject for arbitration.

*New Orleans S.S. Ass'n v. General Longshore Workers, Local 1418,* 626 F.2d 455, 468 (5th Cir.1980),[9] *affirmed sub nom. Jackson Bulk Terminals, Inc. v. Longshoreman's Ass'n.,* 457 U.S. 702, 102 S.Ct. 2673, 73 L.Ed.2d 327 (1982). A number of other circuits have followed the holding of *New Orleans S.S. E.g. Courier-Citizen Co. v. Boston Electrotypers Union No. 11,* 702 F.2d 273, 280 (1st Cir.1983) (citing *New Orleans S.S.* for the proposition that "Courts have generally refused to rule on the precedential effect of an arbitration award, taking the position that the question is properly resolved through arbitration"); *Oil, Chemical & Atomic Workers Int'l. Union, Local 4–367 v. Rohm & Haas, Texas Inc.,* 677 F.2d 492, 494 (5th Cir.1982). In *Little Six Corp. v. United Mine Workers of America, Local 8332,* 701 F.2d 26 (4th Cir.1983), the Fourth Circuit was faced with facts indistinguishable from those presented here. There an employer brought a section 301 action seeking injunctive and declaratory relief to prevent the Union from seeking arbitration of a grievance. The employer claimed that arbitration of the grievance should be foreclosed because the employer had won a previous arbitration that involved interpretation of the same clause of the collective bargaining agreement. The Fourth Circuit adopted our *New Orleans S.S.* holding in rejecting the employer's claims. *Id.* at 29. *See also Boston Shipping Ass'n. v. Int'l. Longshoremen's Ass'n.,* 659 F.2d 1 (1st Cir. 1981).[10]

---

**8.** Removal of an arbitrator's jurisdiction to decide matters of contract interpretation, even if those matters have been previously decided, is particularly injurious to the goals of federal labor policy. "The processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware." *American Mfg. Co.,* 363 U.S. at 568, 80 S.Ct. at 1346.

**9.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit has adopted the case law of the former Fifth Circuit handed down as of September 30, 1981, which is binding unless and until overruled or modified by this Court en banc.

**10.** United and the district court placed primary reliance on *Oil, Chemical and Atomic Workers Int'l. Union, Local No. 4–16000 v. Ethyl Corp.,* 644 F.2d 1044 (5th Cir. Unit A 1981). In that case an arbitrator determined that the employer's practice of assigning supervisory personnel to jobs normally done by non-supervisory union employees violated the collective bargaining agreement. The award expressly ordered that the company "desist from like violations." The Court enforced the prospective award by enjoining conduct that is not "arguably permissible under the relevant provision [of the] collective bargaining agreement." *Id.* at 1051. Where the conduct was not "arguably permissible" under the arbitrator's interpretation of the contract,

Moreover, we find little persuasive force in United's arguments in support of the district court's judgment. First, United urges that a declaratory judgment mandating that the Crane award be binding precedent for future arbitrations is necessary to protect the finality of that award. This argument assumes its conclusion. The "finality" of the Crane award would be upset by future awards that interpreted section 3.01–D differently only if the Crane award was viewed as imposing a "law of the contract" on future arbitrators. We protect the finality of the award in a res judicata sense by upholding it on the merits and requiring that it be enforced, but whether or not the award is "final" in a stare decisis sense is an issue for further arbitration.[11] Nor are we apprehensive about the possibility of rearbitration of section 3.01–D's applicability. We find it unnecessary to protect the arbitral process from such repetitive grievances because the arbitral process is quite capable of protecting itself. "Open to [the Company], before the arbitrator, is the same contention it has presented to the courts, i.e., that the 'same question or issue' was previously 'the subject of arbitration'." *Little Six Corp.*, 701 F.2d at 29. If the arbitrators wish to establish a binding "law of the contract," they are able to do so on their own without the interference of the courts.[12] Nor do we fear repeated relitigation of future arbitrators' interpretations

of section 3.01–D. We have affirmed the district court's determination that the arbitrator's interpretation of section 3.01–D was within his power, and any future challenges to similar arbitral interpretations of the agreement would be legally meritless. Such challenges could be disposed of summarily. We would gain no advantage in judicial economy by mandating that this award have precedential effect. Quite the opposite, affirming the district court's award would likely mire the courts in overseeing the precedential system they had created.

Second, United contends that section 16.-03–C of the contract, the "final and binding" clause, *see* note 7, *supra,* constitutes an agreement that arbitral awards will be binding precedent for future arbitrations. We regard this as a questionable interpretation of that section. We find more plausible that section 16.03–C is a statement that arbitration awards will have *res judicata* effect. Support for this alternative interpretation can be found in section 16.-01–B(1), which provides that "each grievance upon which arbitration is requested shall be handled by a separate arbitrator and separate hearing." In any event, whether section 16.03–D establishes arbitration as binding precedent is a matter of contract interpretation for the arbitrator, not the courts.

further arbitration over the permissibility of the conduct would not be permitted. United contends that *Ethyl Corp.* constitutes a precedent for the Court to declare an arbitrator's contract interpretation binding in future disputes. We disagree. The arbitrator's award in *Ethyl Corp.* was expressly prospective; the award in this case is not. The Court in *Ethyl Corp.* was faced with the unique problem of enforcing the arbitrator's prospective prohibition without usurping the role of future arbitrators. In enjoining the employer from "like violations" the Court repeatedly emphasized that it was doing no more than enforcing the exact terms of the arbitrator's order. The ˈ ˌder in this case relates only to the single factual dispute presented to arbitrator Crane; enforcement of that order does not require this Court to fashion any prospective relief. Awards such as this one, which *approve* rather than *prohibit* a course of conduct, are not in their nature prospective and are

unlikely to fall within the narrow class of cases described by *Ethyl Corp.* Any broader reading of the *Ethyl Corp.* decision would clearly conflict with our holding in *New Orleans S.S.*

11. Furthermore, a judicially-created system of arbitral precedent would be likely to impair the flexibility arbitrators require to respond to changing conditions or new factual situations that may arise in the shop, an environment with which the arbitrator has a special familiarity foreign to the courts. *See Courier-Citizen Co., supra,* 702 F.2d at 280, *see also Warrior & Gulf,* 363 U.S. at 581, 80 S.Ct. at 1352.

12. Indeed, this case demonstrates the arbitral system's ability to develop its own precedent. Arbitrator Crane explicitly followed the previous award of arbitrator Rimer in construing section 3.01–D.

For the foregoing reasons, we AFFIRM the district court's dismissal of Count I of the Union's complaint, we REVERSE the district court's dismissal of Count II of the complaint and its entry of declaratory judgment pursuant to the Company's counterclaim, and we REMAND with instructions to enter an order requiring United to submit the twenty-one listed grievances to arbitration.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.