HOLLY SUGAR CORP., Appellant,

v.

DISTILLERY, RECTIFYING, WINE & ALLIED WORKERS INT'L UNION, AFL–CIO, et al., Appellees.

No. 22152.

United States Court of Appeals Ninth Circuit.

June 9, 1969.

---

James C. Paras (argued), J. Hart Clinton, George F. Clinton and John J. Sampson, of Morrison, Foerster, Holloway, Clinton & Clark, San Francisco, Cal., for appellant.

Roland C. Davis (argued) and Alan C. Davis, of Carroll, Davis, Burdick & McDonough, San Francisco, Cal., for appellees.

Before CHAMBERS, JERTBERG, and ELY, Circuit Judges.

ELY, Circuit Judge:

*Again we meet a problem concerning enforcement of arbitration awards.* The appellant employer, Holly Sugar, insists that the award should not be enforced because the arbitrator, in making it, exceeded his powers as defined by the bargaining agreement. The District Court rejected the argument and declared the award binding in all respects. We affirm.

The parties to the bargaining compact are the three major producers of Cali-

fornia beet sugar (Holly Sugar Corporation, American Sugar Corporation, Spreckels Company) and several unions affiliated with the United Sugar Workers Council of California and the Distillery, Rectifying, Wine and Allied Workers International Union, AFL–CIO (hereinafter the "Union"). The bargaining agreements apply to a number of processing plants of these three companies and contain virtually identical provisions. For each plant, however, there is a separate list of jobs and corresponding wage rates which vary according to the needs of a particular factory. The instant controversy pertains to a time period covered by two successive bargaining agreements and concerns a disagreement as to the proper wage and job classification for one Harold Zimmer, an employee at one of Holly's plants. There are several differences between the two applicable bargaining contracts; however, in relation to the dispute before us, the only important difference is that the first contract's job list did not include any classification for painters at the Holly factories whereas the current agreement provides for a "Painter (Spray Gun Only)" at those plants.

Zimmer, a journeyman painter, was hired by Holly in March 1964, and for the next two years was engaged exclusively in painting projects. Since, at the time of Zimmer's original employment there was no "Painter" job classification, Holly classified Zimmer as a "Mechanic's Helper", and from March 1964 through February 28, 1965, paid Zimmer according to the rate assigned that classification. After the second contract became effective on March 1, 1965, Zimmer was paid a higher rate under the new classification, "Painter (Spray Gun Only)", while he was engaged in preparing, actually using, or cleaning spray gun equipment. Holly continued, however, to compensate Zimmer at the lower "Mechanic's Helper" rate for his work in preparing surfaces to be spray painted and for painting or preparing to paint with a brush or roller.

Since it was the practice of the other California beet producers who were covered by the collective bargaining agreement and who employed full time painters to pay such workers at higher rates under a general classification of "Painters", the Union filed this grievance in Zimmer's behalf. The Union insisted that Holly had, in effect, created a "new job" when it employed Zimmer and was bound under the terms of both contracts to either negotiate or arbitrate the appropriate classification and wage rate. In addition, the Union charged that there was an improper application of the new classification, "Painter (Spray Gun Only)", in the Company's refusal to pay Zimmer according to the classification's wage rate for his work in preparing surfaces for painting.

The arbitrator, one Burns, rendered an award which, in general, upheld the Union's position. He held that Holly had indeed created a "new job", within the meaning of Section XVII(2),[1] when it hired Zimmer. Moreover, he concluded that Section XVII(2) and Section VII(G) [2] require that when a "new job"

---

1. Section XVII(2) of the collective bargaining agreement provides:

    "2. NEW JOBS. In the event any new jobs are created, the work classifications and wage rates therefor shall be negotiated by the Employer and the Union, provided, however, should the parties fail to agree on the work classifications and wage rates for any such new jobs, the Employer shall have the right to fill such new jobs and fix the work classifications and wage rates therefor, subject to the Union's right to refer the matter of the work classifica-

tions and wage rates of such new jobs to normal grievance procedure."

2. Section VII(G) of the collective bargaining agreement provides in part:

    "G. Posting of Jobs. Vacancies in jobs requiring prompt filling, will be immediately filled and the Employer will post a notice of the action taken within a reasonable time thereafter. Employer will, for a period of seventy-two (72) hours, exclusive of Saturday and Sunday, after posting such notice, receive written applications from employees who

is created the employer has an affirmative duty to so notify the Union, as well as to post notice of its creation. And, since throughout the period in controversy other plants covered by the agreement had a "Painter" classification established for persons performing work identical to that done by Zimmer, Burns reasoned that Zimmer was entitled to the same wage and classification as his counterparts from the date of his initial hiring. The arbitrator also found that Holly had incorrectly applied the new classification "Painter (Spray Gun Only)". He explained that it is normally the responsibility of any painter, whether he paints by spraying, brushing, or rolling, to prepare surfaces either by brushing or cleaning and that because nothing indicated that these normal duties should be excluded for purposes of the job classification agreed upon by the parties in 1965, Zimmer was entitled to a painter's rate for all time spent in such "painting activities."

Holly's appeal presents the usual argument of parties seeking to invalidate adverse arbitration awards. The Company insists that, under the teachings of the "Trilogy",[3] the question of whether a particular grievance is arbitrable requires less judicial scrutiny than the question of whether an award once rendered is enforceable. Arguing that the arbitrator exceeded his powers, the appellant relies principally on United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S. Ct. 1358, 4 L.Ed.2d 1424 (1960).

"[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award."

*Id.* at 597, 80 S.Ct. at 1361.

■■■ It is well established that arbitration is a matter of contract and that arbitration provisions are construed with great liberality. *See, e.g.* United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 Sup.Ct. 1347, 4 L.Ed.2d 1409 (1960). Moreover, Holly is quite correct in its argument that simply because a court would compel arbitration in a particular dispute does not necessarily mean that it would approve of everything or anything which the arbitrator might decide in resolving the dispute. See Torrington Co. v. Metal Products Workers Union, 362 F.2d 677 (2d Cir. 1966); International Ass'n of Machinists AFL–CIO v. Hayes Corp., 296 F.2d 238 (5th Cir. 1961), rehearing denied, 316 F.2d 90 (1963). However, if the scope of judicial review in post-award proceedings were as broad as the appellant suggests, we would be tempted to slip into the practice, so prevalent before the "Trilogy", of "deciding the merits in the guise of adjudicating the court-reserved issue of the scope * * * of the agreement to arbitrate." United States Gypsum Co. v. United Steelworkers, 384 F.2d 38, 49 (5th Cir. 1967), cert. denied, 389 U.S. 1042, 88 S. Ct. 783, 19 L.Ed.2d 832 (1968) (citations omitted). *See also* Safeway Stores v. American Bakery & Confectionery

---

believe they are entitled to fill such vacancies under the terms of the seniority clause. * * * Vacancies which do not require filling in less time will be posted at least seven (7) days prior to filling, provided, however, that vacancies at the beginning of campaign which require filling in less time will be posted for at least seventy-two (72) hours, exclusive of Saturday and Sunday. * * * *"

3. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed. 2d 1424 (1960).

Workers International Union, 390 F.2d 79 (5th Cir. 1968); Boeing Co. v. International Ass'n of Machinists, 381 F.2d 119 (5th Cir. 1967); Dallas Typographical Union No. 173 v. A. H. Belo Corp., 372 F.2d 577 (5th Cir. 1967).

■ Accordingly, while the courts must insure that the arbitrator's award "draws its essence from the collective bargaining agreement" and that his decision does not "manifest an infidelity to this obligation," 363 U.S. at 597, they must resist "the temptation to 'reason out' a la judges the arbiter's award to see if it passes muster." Safeway Stores v. American Bakery & Confectionery Workers International Union, *supra* at 83. Therefore, if, on its face, the award represents a plausible interpretation of the contract in the context of the parties' conduct, judicial inquiry ceases and the award must be affirmed. *See* San Francisco-Oakland Newspaper Guild v. Tribune Publishing Co., 407 F.2d 1327 (9th Cir. 1969). *See also* Anaconda Co. v. Great Falls Mill & Smelterman's Union, 402 F.2d 749 (9th Cir. 1968).

## TIMELINESS OF THE GRIEVANCE

The Company insists that the Union's grievance was not arbitrable since it involved, in large part, a dispute under the expired 1962 bargaining agreement and was not filed within the thirty-day period required by both contracts.[4] These contentions were presented to the arbitrator, who concluded that the Company's failure properly to notify the Union concerning the true nature of Zimmer's work tolled any time provisions within the agreements requiring the Union to negotiate or arbitrate a wage rate for that employee. He wrote:

"Since the company failed to comply with its obligations under the 1962 contract which would have had the effect of putting the union on notice of

the employment of Zimmer and the establishment of a job that consisted exclusively of painting and work in connection with painting, the 30-day limitation of both the 1962 and the 1965 contracts was tolled until knowledge or information was received by the union which would have the effect of putting the union on notice. This knowledge was not received until the early part of 1966 when the grievance here under consideration was filed.

"Although the 1962 contract has been superseded by the 1965 contract, grievances under the 1962 contract were not barred by its expiration in March 1965. Grievances would be barred only by the limitation period contained in the 1962 contract or by the statutory limitations applicable to written contracts or by laches. Since both the 30-day limitation of the 1962 contract and any other limitation were tolled because of the failure of the company to give or impart notice of the establishment of the painter job in 1964 to the union, there is no bar in the contract or at law or equity to the assertion by the union that a Painter classification should have been established in March 1964. * * * "

■■ Certainly, there is no inherent prohibition against arbitration awards which are based upon the violation of an expired collective bargaining agreement. *See, e.g.*, United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); Monroe Sander Corp. v. Livingston, 377 F.2d 6 (2d Cir.), cert. denied, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed. 2d 89 (1967); Local 7–644 Oil, Chem. & Atomic Workers International Union AFL–CIO v. Mobil Oil Co., 350 F.2d 708 (7th Cir. 1965), cert. denied, 382 U.S. 986, 86 S.Ct. 563, 15 L.Ed.2d 474 (1966); Local Lodge No. 595 of Dist. No. 152 Intern. Ass'n of Machinists v.

---

4. Both contracts contained the following limitation on the arbitrability of grievances:
"All grievances must be presented to the Employer in writing, setting forth in detail the nature of the grievance and must be presented within thirty (30) days of the date of the alleged grievance. Otherwise said grievance will not be considered."

Howe Sound Co., Inc., 350 F.2d 508 (3d Cir. 1965). Zdanok v. Glidden Co., 288 F.2d 99, 90 A.L.R.2d 965 (2d Cir. 1961), aff'd, 370 U.S. 530, 82 S.Ct. 1459, 8 L. Ed.2d 671 (1962). Indeed, such a prohibition would, in a significant number of cases, frustrate the salutary policy of a national law encouraging the solution of lingering labor disputes by grievance procedures established through the collective bargaining processes. We therefore agree with the arbitrator's conclusion that, in the circumstances of this controversy, "[T]here is no bar * * * at law or equity to the assertion by the union that a Painter classification should have been established in March 1964."

Finally, the arbitrator concluded that since Holly had failed to comply with those terms of the contracts which prescribed that formal notice of the circumstances of Zimmer's employment should be given, it could not successfully take the position that, under other provisions of the contract, arbitration was barred because of the delay in the filing of the grievance. We cannot disturb this conclusion. Consistent with our proper scope of review, we express no opinion as to whether our own construction of the contracts would coincide with that of the arbitrator. This is simply not our function. San Francisco-Oakland Newspaper Guild v. Tribune Publishing Co., *supra*. However, we cannot see that the arbitrator was unfaithful to his trust in the sense of having applied a capricious, unreasonable interpretation of the contracts which he was obliged to construe.

## SUBSTANTIVE MERITS OF THE AWARD

[redacted] The employer argues that since the effect of the award is to establish a general classification for painters in the bargaining agreements, the award improperly modifies and enlarges their terms under certain language in both agreements, as follows:

> "It is understood and agreed, however, that proposals to add to or change this contract shall not be arbitrable and that no proposal to modify, amend or terminate this contract may be referred for arbitration under this Section; and no arbitrator shall have any power to amend or modify this contract. * * *"

Holly maintains that Torrington Co. v. Metal Products Workers Union, 362 F.2d 677 (2d Cir. 1966), requires reversal. In *Torrington* the dispute was whether the employer was obligated to grant paid time-off for voting as had been its practice for years. Prior to negotiations for the collective bargaining agreement, Torrington announced that it was discontinuing the time-off benefit, and, at the contract negotiations, the Union failed in its attempt to have this benefit specifically included in the contract. After the new contract went into effect, Torrington, following its earlier announcement, refused to grant paid time for voting. The Union filed a grievance, and the arbitrator determined that the time-off benefit should be implied as part of the new collective bargaining contract. He concluded that, because of the long-standing nature of the benefit, the burden of showing a change of this policy should rest upon the employer and that the employer had not met its burden by simply pointing to the union's failures during negotiations.

The arbitration clause in the *Torrington* agreement contained the same "boiler-plate" prohibitions of awards which "add to," "delete," or "modify" the agreement as did the contracts in the instant case. Relying on this clause, the Court of Appeals for the Second Circuit overturned the award. That Court's interpretation of the history of the negotiations was that the parties agreed not to include the benefit in the new contract, and it held that there was no requirement that the company should have secured agreement for the abandonment of the previously followed practice. *See* 362 F.2d at 681–82.

Holly, relying heavily upon the negotiations leading to the agreement of 1965, insists that the history is comparable to that in *Torrington*. It is true

that during the negotiations in our case, the Union pressed for inclusion of a general painter classification and that Holly successfully resisted. Here, however, the Company's position was based on its representation that it had no need for a full time painter and would not establish a classification for a job which did not exist. Moreover, it was through Holly's representation that the only painting necessary was temporary "catch-up" work done only during those periods of the year when beets were not processed that the Company successfully proposed that only the classification "Painter (Spray Gun Only)" be included. Nevertheless, Holly argues that the parties, by adopting this alternative classification, evidenced a clear intention that the new contract should not contain the general painting classification which it contends that the award, in effect, improperly established.

Holly's interpretation of the 1965 negotiations was rejected by the arbitrator, and, as previously noted, unless wholly unreasonable, his is the interpretation which the courts must accept. To the extent *Torrington* may be read to authorize greater judicial intervention, we cannot accept it. Indeed, we are convinced that the remarks of Judge Feinberg, dissenting in *Torrington*, more accurately describe the permissible scope of judicial involvement. After reviewing the factors on which the arbiter in *Torrington* based the original award, Judge Feinberg concluded:

> "Thus, the arbitrator looked to the prior practice, the conduct of the negotiation for the new contract and the agreement reached at the bargaining table to reach his conclusion. * * * From all of this, I conclude that the arbitrator's award 'draws its essence from the collective bargaining agreement' and his words do not 'manifest an infidelity to this obligation.' Once that test is met, the inquiry ends. Whether the arbitrator's conclusion was correct is irrelevant because the parties agreed to abide by it, right or wrong. Nevertheless, the majority

has carried the inquiry further and concerned itself with a minute examination of the merits of the award, which we are enjoined not to do. * * * Of course, the arbitrator was aware of the company's actions in December 1962 and April 1963 * * * [a]nd I would suppose that what significance to attach to these acts * * * and to the bargaining held thereafter is exactly the sort of question the parties left to the arbitrator to decide."

362 F.2d at 683–84 (citations omitted).

Moreover, other courts have sought to limit *Torrington's* impact by factual distinctions, warning that the opinion should not be so construed as to authorize judicial redetermination of the merits of an arbitration award. *See, e.g.,* Safeway Stores v. American Bakery & Confectionery Workers International Union, *supra,* and cases cited therein. Such an approach would lead us to observe that there is a significant distinction between the power of the *Torrington* arbitrator and that of the arbitrator in our case. Like the contract in *Torrington*, the Holly contract prevents an arbitrator from "adding to" or "modifying" the agreement; however, unlike *Torrington*, the Holly compact contains a specific exception to the general prohibition if disputes concern "new jobs".

> "It is understood and agreed, however, that proposals to add to or change this contract shall not be arbitrable and that no proposal to modify, amend or terminate this contract may be referred for arbitration under this Section; and no arbitrator shall have any power to amend or modify this contract, *except that in the event new jobs are created, the arbitrator shall in such event have the power to act as provided in Section XVII, subparagraph 2, of this contract.*"

(Emphasis added.) The clear implication of this language is that notwithstanding any list of jobs agreed upon by the parties during negotiations, an arbi-

trator may add a "new job" to this list when convinced that, within the practice of the industry, a "new job" has been effectively created.

Affirmed.