RAYBESTOS–MANHATTAN,
INC., Plaintiff,

v.

The AMALGAMATED CLOTHING AND TEXTILE WORKERS INTERNATIONAL UNION (AFL–CIO–CLC), the Amalgamated and Textile Workers Union (AFL–CIO–CLC) Southeast Coastal Joint Board, and Local Union 1836, the Amalgamated Clothing and Textile Workers Union (AFL–CIO–CLC), Defendants.

Civ. A. No. 81–1655–8.

United States District Court,
D. South Carolina,
Charleston Division.

Aug. 12, 1982.

J. Rutledge Young, Jr., Charleston, S. C., for plaintiff.

Ray P. McClain, Charleston, S. C., for defendants.

## ORDER

BLATT, District Judge.

This matter is before the court upon the parties' cross motions for summary judgment under Fed.R.Civ.Pro. 56. Plaintiff seeks, pursuant to 9 U.S.C. § 10(d), to vacate an arbitration award previously entered in accordance with the collective bargaining agreement between the parties. Defendant has responded with a motion seeking confirmation of the arbitrator's award under 9 U.S.C. § 9.

## SUMMARY OF FACTS

Raybestos-Manhattan, Inc., the plaintiff employer, and the Amalgamated Clothing and Textile Workers International Union (AFL–CIO–CLC), are parties to a collective bargaining agreement, dated March 1, 1980, that covers the terms and conditions of employment of production and maintenance workers at plaintiff's plant in North Charleston, South Carolina. Defendant has been the duly certified bargaining agent for many years preceding the development of the present dispute.

One of the products of the North Charleston Plant is an expansion joint that is widely used in the ducting systems of various industrial facilities. Some time after this expansion joint was introduced, it became obvious that the joints, which are riveted and sewed, would require occasional repair and maintenance. In 1974, the employer began sending members of the bargaining unit represented by the union on such repair trips. As the arbitrator found, "[t]here absolutely is no disagreement between the parties that almost from the beginning of

the field trips, about 1974, up until the Company['s] discontinuance [of the practice] in 1980, the uniform and constant response to the service and maintenance problems was to assign bargaining unit employees, in addition to non-bargaining unit employees [to the field trips]. It became the accepted way of handling this kind of work." Award at 10. The frequency of these field trips was about twenty-five per year for bargaining unit employees until 1979; after May, 1979, there were five to ten trips each months. Award at 10–11.

The current collective bargaining agreement between the parties was effective March 1, 1980. For the first several months of the new contract period, the company continued the practice of offering field trip work to bargaining unit employees represented by the union,[1] Award at 5, although the text of the agreement does not specifically mention field trip work. In June, 1980, the company unilaterally, without discussions with the union, ceased offering field trip assignments to employees in the bargaining unit. Award at p. 5; Pl. Memorandum at 4. The union viewed the company's action as a unilateral change of working conditions and filed a grievance seeking continuance of the field trip assignments and back pay. The arbitrator found that the company had unilaterally changed working conditions and ruled that future field trips should be assigned to bargaining unit employees on the basis of the past practice, with one bargaining unit employee, chosen on a voluntary basis, to be sent on each field trip and to be paid a fifty percent premium over his regular pay rate for the work. Award at 15. No back pay was awarded by the arbitrator. Award at 17.

In reaching the award, the arbitrator carefully considered and discussed each of the principal arguments advanced by the company here, to wit, that the "Management Rights Clause" (Article IV) vested the right to change work assignments in management and that the "Inclusiveness Clause" (Article XXXIX)[2] prohibited reference to past practice. The management rights clause included a qualifier that such rights could be "specifically limited or otherwise provided [for] in this Agreement," and the arbitrator found that the employer's recognized practice concerning field trips, which was continued under the 1980 contract, was such a qualification of the agreement, limiting management discretion. With respect to the inclusiveness clause, the arbitrator found that the agreement was intended to "supersede and replace all previous agreements and practices, both written and oral" only when the agreement specifically referred to a topic. Since the agreement has no unambiguous language describing field trips, or any other production or maintenance work, the arbitrator found that the inclusiveness clause was irrelevant in light of the conceded past practice with respect to work assignments. After the arbitrator rendered his decision, the employer brought this action to vacate the award.

## CONCLUSIONS OF LAW

Generally speaking, "the question of interpretation of the collective bargaining

---

1. The unit employees declined trips during this period because they were utilizing the grievance procedure and negotiations to clarify the pay rates applicable to these trips. In negotiations leading up to the 1980 contract, the union had made proposals for a special premium pay rate for field trips; these specific pay proposals were rejected by the employer, but, as the arbitrator found, the employer did not repudiate field trips for unit employees during the negotiations nor did it repudiate the union's right to negotiate about pay rates for field trips. Award at 12. Instead, the company continued to offer field trip work to bargaining unit employees under the new contract.

2. The inclusiveness clause states that the contract "constitutes the entire agreement between the parties ...." It is admitted by the company, however, that nothing in the collective bargaining agreement describes what work was assigned to the production and maintenance employees. As is noted later in this order, this omission is an important example of the fact that the written terms of the agreement do not cover all aspects of the industrial employment relationship in the subject plant.

agreement is a question for the arbitrator," *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960); "the question of arbitrability is for the courts to decide." *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 578, 583 n.7, 80 S.Ct. 1347, 1353 n.7, 4 L.Ed.2d 1409 (1960). In disputes concerning the scope of arbitration clauses in collective bargaining agreements, "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 582–83, 80 S.Ct. at 1352–1353. *E.g., International Ass'n of Machinists and Aerospace Workers v. Gen'l. Elec. Co.*, 406 F.2d 1046 (2d Cir. 1969); *Local Union No. 787 v. Collins Radio Co.*, 317 F.2d 214 (5th Cir. 1963). The dispositive issue on the question of arbitrability is whether the "award ... draws its essence from the collective bargaining agreement." *Enterprise Wheel & Car Corp.*, 363 U.S. at 597, 80 S.Ct. at 1361. "Doubts should be resolved in favor of coverage." *Warrior & Gulf Nav. Co.*, 363 U.S. at 583, 80 S.Ct. at 1353.

Both parties have agreed that this case must be decided in light of the "backdrop of well-established federal labor policy favoring arbitration as the means of resolving disputes over the meaning and effect of collective bargaining agreements." *Nolde Bros., Inc. v. Bakery Workers*, 430 U.S. 243, 254, 97 S.Ct. 1067, 1073, 51 L.Ed.2d 300 (1977), *aff'g*, 530 F.2d 548 (4th Cir. 1975). That fundamental policy has been held to require the arbitration of disputes after the union declared the contract terminated, as in *Nolde Bros.*, and to require the arbitration of disputes by a successor employer under the predecessor's collective bargaining agreement. *John Wiley & Sons v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

■ When arbitration is provided for in the collective bargaining agreement, the Court of Appeals for the Fourth Circuit has recently recognized that the arbitrator's power is broad and that the primary responsibility of the arbitrator is to construe the agreement. *Norfolk Shipbuilding & Drydock Corp. v. Local No. 684, International Brotherhood of Boilermakers, etc.*, 671 F.2d 797 (4th Cir. 1982). While the arbitrator is, of course, bound by the authority given him under the agreement between the parties, " '[i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation is different from his.' " *Id.* at 799, *quoting United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960). The Fourth Circuit vacated the decision of the district court and stated that "[i]n construing the collective bargaining agreement, ... the arbitrator *must* take into account any existing common law of the particular plant or industry, for it is an integral part of the contract. *Id.* (emphasis added). *See, e.g., Enterprise Wheel & Car Corp.*, 363 U.S. at 596, 80 S.Ct. at 1360; *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 578–81, 80 S.Ct. 1347, 1350–1352, 4 L.Ed.2d 1409 (1960).

■ It is well established that the arbitrator has authority to construe ambiguous provisions of a contract and that his construction thereof is binding. *Monongahela Power Co. v. Local No. 2332, I. B. E. W.*, 566 F.2d 1196, 1199 (4th Cir. 1976). *See also Nolde Bros., Inc. v. Bakery Workers*, 530 F.2d 548 (4th Cir. 1975). Thus, the first principle relied upon by plaintiff is a very narrow one: that unambiguous contract provisions cannot be overridden by an arbitrator. If, in fact, the contract, taken as a whole, can be construed to be ambiguous with respect to the matters resolved by the arbitrator, this court is without authority to disturb the award.

As previously noted, the contract in question took effect on March 1, 1980. Bargaining unit employees, represented by defendants, were offered the work in question through June, 1980. The employer relies

upon Article IV and Article XXXIX of the collective bargaining agreement as allegedly establishing an "unambiguous" right to reassign the field trips. The arbitrator, however, reasonably found both clauses to be ambiguous with respect to the field trips in question.

■ First, the arbitrator considered the employer's contention that management had the exclusive right to change or reorganize duties or assign work, under the management rights clause. He noted, correctly, that this clause includes "a standard qualifier ... which reads '... except as specifically limited or otherwise provided in this Agreement ....'" Award at 8. The proven practice of offering field trips to bargaining unit employees, which had continued into this contract period, was, as the arbitrator construed it, such a limitation. Reference to such practice is not only proper, but virtually essential in labor arbitration matters. *See, e.g., Norfolk Shipbuilding & Drydock Corp. v. Local No. 684,* 671 F.2d 797 (4th Cir. 1982). Also, as the union pointed out in the arbitration, Award at 5, the management rights clause could be construed to preclude management from assigning work previously available to bargaining unit employees exclusively to non-unit employees. Such a reduction of work available to bargaining-unit employees is a classic example of a dispute subject to arbitration, as evidenced by *United Steelworkers of America v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). As the arbitrator noted, the agreement relieved either party of bargaining during the three-year term of the contract, but that agreement required that the contract terms be adhered to, including "the work assignments and pay of a number of bargaining unit employees" that were af-

fected by the discontinuance of the field trips. Award at 9.

In this connection, it should be emphasized that the agreement does not enumerate the work tasks that the employees in the bargaining unit will perform. *See* note 2, *supra.* In argument, the employer conceded that it could not arbitrarily and unilaterally reassign "production and maintenance work," or work performed exclusively by the unit, outside the unit.[3] All the arbitrator found was that any work that had been dedicated to bargaining unit employees was subject to the same restrictions, whether or not it was performed exclusively by the unit. An evaluation of such a question as this is clearly within the competence of the arbitrator and not of this court.

■ Second, the arbitrator properly rejected the assertion that the inclusiveness clause could unambiguously resolve this dispute. The arbitrator's view was that this clause could apply only if the agreement included "some language related to field trips...." Award at 8. Since the agreement is silent on this point,[4] he found himself obligated to apply "industrial common law" to resolve the dispute.

■ The arbitrator's approach was clearly proper. In the employer's view, any point that is not reflected within the four corners of the collective bargaining agreement is not subject to disposition by an arbitrator. This is precisely the philosophy rejected by the Supreme Court in the landmark *United Steelworkers* trilogy. *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers of America v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d

---

**3.** In fact, unilateral assignment of work outside the bargaining unit has often been held to be an unfair labor practice. *See, e.g., N. L. R. B. v. North Carolina Coastal Lines, Inc.,* 542 F.2d 637 (4th Cir. 1976).

**4.** The employer argued at the hearing that there are no cases that authorize an arbitrator to construe a contract without reference to some specific provision that is found to be ambiguous. But the agreement that was re-

ferred to arbitration in *Warrior & Gulf Nav. Co.* was silent concerning the issue to be arbitrated there and the union had sought unsuccessfully for years to include such language in the contract. 363 U.S. at 583–85, 80 S.Ct. at 1353–54. The agreement at issue there had a management rights clause at least as strong as the one at issue in this case, yet the Court held the issue to arbitrable. *Id.* at 587, 80 S.Ct. at 1355.

1409 (1960); *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. See Shulman, Reason, Contract, and Laws in Labor Relations, 68 Harv.L. Rev. 999, 1004–1005. The collective bargaining agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant. As one observer has put it: " '. . . [I]t is not unqualifiedly true that a collective-bargaining agreement is simply a document by which the union and employees have imposed upon management limited, express restrictions of its otherwise absolute right to maintain the enterprise, so that an employee's claim must fail unless he can point to a specific contract provision upon which the claim is founded. There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties. One cannot reduce all the rules governing a community like an industrial plant to fifteen or even fifty pages.' "

The employer relies most heavily upon the holding of the Fourth Circuit in *Monongahela Power Co. v. Local No. 2332 International Brotherhood of Electrical Workers*, 566 F.2d 1196 (4th Cir. 1976). A review of that decision shows that it is clearly distinguishable from the matter before the court here. In *Monongahela Power*, the collective bargaining agreement gave the employer the unlimited right to discharge or discipline employees who engaged in an illegal work stoppage. The employees engaged in such a work stoppage and, upon their return to work, were all disciplined in a manner which the employer felt appropriate under the circumstances. Despite the contract's clear language giving the Company "the unqualified right to discharge or discipline any or all employees who engage" in an illegal work stoppage, the arbitrator substituted his judgment for that of the employer and modified the discipline. In addition to this unambiguous contract provision, there is no indication that the arbitrator in *Monongahela Power* relied in any way upon past practice.

The arbitrator's decision involved in this proceeding does not remotely resemble the one involved in *Monongahela Power*. The instant collective bargaining agreement does not contain language allowing the employer to remove job duties from the bargaining unit. The union claimed that the employer's unilateral decision to use exclusively non-bargaining unit employees for field trips violated, *inter alia*, the "Recognition Clause" (Article I) of the collective bargaining agreement. The arbitrator examined the contract and the arguments of the parties and found no unambiguous language specifically allowing the Company to make the decision that had been made. Then, after applying all of the terms of the contract, as well as the "law of the shop," the arbitrator found that plaintiff had violated the collective bargaining agreement and ruled in favor of the union. Thus, the holding in *Monongahela Power* is clearly not dispositive of this dispute.

Plaintiff also relies heavily on *Torrington Company v. Metal Product Workers Union, Local 1645*, 362 F.2d 677 (2d Cir. 1966), arguing that the unsuccessful negotiations concerning the question of field trips prior to the March, 1980, collective bargaining agreement, *see* note 1, *supra*, supported plaintiff's contention that the question fell outside the scope of the agreement as finalized, which, as previously noted, contained no specific mention of field trips. However, *Torrington* does not provide a sound legal foundation for this contention. The contested issue in *Torrington* concerned the arbitrability of a dispute over the employer's discontinuance of its past practice of allowing employees time off with pay on election day. This unilateral practice "was not a part of the then-existing collective bargaining agreement, which contained an extremely narrow arbitration provision."

*Id.* at 678. Moreover, the practice was officially discontinued by notice to the union prior to the negotiation and signing of the 1964 collective bargaining agreement, *see id.* at 678, 681–82, which "contained a much less restrictive arbitration clause." *Id.* During the negotiations leading up to the 1964 agreement, both parties attempted unsuccessfully to insert their own voting clauses; however, the contract that was eventually signed "contained . . . no mention of paid time off for voting." *Id.* The Second Circuit Court of Appeals held that, under these circumstances, the arbitrator's reliance on the employer's past practice fell outside the scope of the 1964 agreement and, therefore, "the arbitrator exceeded his authority by ruling that such a benefit was implied in the terms of that agreement." *Id.* at 682.

Subsequent decisions in that circuit have limited the holding of *Torrington* and other jurisdictions have questioned the logic of the decision. In *Humble Oil & Refining Co. v. Local 866, etc.,* 447 F.2d 229 (2d Cir. 1971), the court stated:

> In *Torrington,* we found nonarbitrability where an arbitrator had relied on a past unilateral practice of the company which the company had terminated two years before the arbitrated dispute arose. In the negotiations resulting in the applicable agreement in that case, there had been discussion of the possibility of reviving past practice to grant employees time off on election days. But the final agreement itself contained no provision remotely bearing on employee rights for election day time off. Thus, in *Torrington,* the arbitrator relied not at all on specific language in the collective bargaining agreement.

*Id.* at 233. Similarly, in *F & M Schaefer Brewing Co. v. Local 49, etc.,* 420 F.2d 854 (2d Cir. 1970), the court also distinguished *Torrington Co.* "[T]hat case is not controlling here. In *Torrington,* we were concerned with the court's power to set aside

an award when, according to the majority, the arbitrator had made clear that he did not rely on the provisions of the contract." [5] *Id.* at 856. Thus, the Second Circuit Court of Appeals has limited the holding of *Torrington* to situations in which the collateral bargaining agreement "contain[s] no provision remotely bearing on [the dispute] . . .," *Humble Oil & Refin. Co.,* 447 F.2d at 233, and has consistently distinguished situations in which the agreement contains "an opaque but 'express provision' . . . governing the rights at issue . . . ." *Id.*

Other jurisdictions have also limited *Torrington* to its facts. In *Textile Workers Union of America v. Textile Paper Prod. Inc.,* 405 F.2d 397 (5th Cir. 1968), the court held that *Torrington* was "clearly distinguishable," *id.* at 399, since it involved a "dispute . . . based on subject matter entirely outside the scope of the agreement." *Id.* The court also noted that the arbitrator's consideration of industry practices was not *per se* improper, but rather it was the reliance on practices "prior to the signing of the agreement . . .," *id.* at 399–400, as opposed to practices "contemporaneous . . . with and . . . following the signing of the agreement," *id.* at 400, that was impermissible. In *Holly Sugar Corp. v. Distillery, Rectifying, Wine & Allied Workers Internat'l. Union,* 412 F.2d 899 (9th Cir. 1969), the court upheld an arbitration award concerning a dispute that was also the subject of prior unsuccessful contract negotiations despite the employer's reliance on *Torrington,* noting that "other courts have sought to limit *Torrington's* impact by factual distinctions . . . ." *Id.* at 905. The court went on to endorse Judge Feinberg's dissent in *Torrington. Id.*

Thus, a review of the pertinent decisional law indicates that the Second Circuit, as well as other jurisdictions, have limited the holding of *Torrington* to those situations in which the industry practices concern issues that are wholly outside the scope of the

---

**5.** Indeed, the court emphasized that "the question of the arbitrator's authority to make a particular award was best left to the arbitrator initially, so that they could receive 'the benefit of the arbitrator's interpretive skills as to . . . his contractual authority.' " *Id., quoting Torrington Co.,* 362 F.2d at 680, n.6.

collective bargaining agreement; *Torrington* has not been applied to situations in which the industry practices may be relevant in interpreting and applying ambiguous provisions of the collective bargaining agreement to specific disputes. In the present case, the arbitrator looked to the industry practices in order to delineate the scope of Article I and Article IV of the collective bargaining agreement. The utilization of industry practices for this purpose is clearly permissible; "[t]he labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960).

Moreover, the factual distinction between prior industry practices and contemporaneous industry practices, which has frequently been used by courts to distinguish *Torrington*, is also pertinent here. In the present case, unlike *Torrington*, the practice of offering field trips to bargaining unit employees continued for three months into the current contract period. Award at 5. Use of contemporaneous industry practices has been consistently approved by the courts. *See, e.g., Textile Workers Union of America v. Textile Paper Prod., Inc.*, 405 F.2d 397, 399–400 (5th Cir. 1968). *See also Randall v. Lodge 1076, International Ass'n. of Machinists*, 648 F.2d 462 (7th Cir. 1981); *Safeway Stores v. American Bakery & Confectionary Workers International*, 390 F.2d 79 (5th Cir. 1968).

■ Finally, the mere fact that this dispute was the subject of unsuccessful contract negotiations does not preclude the use of pertinent industry practices in interpreting ambiguous contract provisions. *E.g., Holly Sugar Corp. v. Distillery, Rectifying, Wine & A. W. I. U.*, 412 F.2d 899 (9th Cir. 1969). The crux of the decision in *Torrington* was not that the arbitrator's consideration of the industry practices was improper because of the unsuccessful contract negoti-

ations, but rather that consideration was improper because the industry practices were wholly outside the scope of the collective bargaining agreement and were not relevant to any ambiguous contractual provision. Since the industry practices here are arguably relevant to certain contractual provisions, consideration of the practices is appropriate notwithstanding the unsuccessful contract negotiations.

■ Plaintiff's additional claim that the arbitrator's award must be vacated because it lacked factual basis clearly shows that plaintiff is seeking a substitution of this court's judgment for that of the arbitrator. Under all of the relevant authority, the court cannot undertake this task. *Amoco Oil Co. v. Oil, Chemical & Atomic Workers*, 548 F.2d 1288 (7th Cir. 1977) *cert. denied*, 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977). Finally, plaintiff asserts that the arbitrator exceeded his authority because he could not "add to, delete or modify any of the provisions of the agreement." Specifically, the employer complains that the arbitrator expanded the scope of the recognition clause by finding production and maintenance employees to be entitled to customer service work, and improperly established a wage scale for that work. However, it is plain that the arbitrator's construction of the agreement was a reasonable one. He held that the agreement covered any work done by production and maintenance employees, regardless of the character of the work. Award at 7–8. There is nothing unreasonable in this construction. As previously noted, the contract does not specifically state what work is to be performed by these employees. Furthermore, it is clear that the arbitrator did not establish a wage scale which had no prior existence. The entire point of the arbitrator's award was that the wage scale had already been established by the "industrial common law" that the parties had asked him to declare. It is clear that the arbitrator's choice of remedies must be quite flexible. *Tobacco Workers v. Lorillard Corp.*, 448 F.2d 949, 955 (4th Cir. 1971). The remedy he has chosen here was well

within both his discretion and a reasonable interpretation of the agreement.

For the foregoing reasons, defendants' motion for summary judgment is granted and plaintiff's motion for summary judgment is denied, and the award of the arbitrator is affirmed.

AND IT IS SO ORDERED.