UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

WINSTON-SALEM MAILERS UNION 133, CWA,

*Plaintiff-Appellee,*

v.

MEDIA GENERAL OPERATIONS, INCORPORATED, d/b/a Winston-Salem Journal,

*Defendant-Appellant.*

No. 02-1145

Appeal from the United States District Court
for the Middle District of North Carolina, at Winston-Salem.
N. Carlton Tilley, Jr., Chief District Judge.
(CA-00-737-1)

Argued: December 5, 2002

Decided: January 15, 2003

Before KING, Circuit Judge,
Henry M. HERLONG, JR., United States District Judge
for the District of South Carolina, sitting by designation,
and James P. JONES, United States District Judge for the
Western District of Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Louis Michael Zinser, THE ZINSER LAW FIRM, P.C., Nashville, Tennessee, for Appellant. John David James, SMITH,

JAMES, ROWLETT & COHEN, L.L.P., Greensboro, North Carolina, for Appellee. **ON BRIEF:** Glenn E. Plosa, THE ZINSER LAW FIRM, P.C., Nashville, Tennessee, for Appellant.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

### OPINION

PER CURIAM:

Media General Operations, Inc. ("Media General") owns several newspapers, including the *Winston-Salem Journal* (the "*Journal*"), a daily newspaper published in Winston-Salem, North Carolina. In 1997, Media General entered into a collective bargaining agreement (the "Agreement") with the Winston-Salem Mailers Union Local 133 (the "Union"),[1] and this action arises out of Media General's refusal to arbitrate several grievances brought by the Union. In August of 2000, the Union filed suit in the Middle District of North Carolina, seeking to compel arbitration. The district court awarded summary judgment to the Union in December of 2001. *Winston-Salem Mailers Union No. 133, CWA v. Media General Operations, Inc.*, Memorandum Opinion, No. 1:00CV00737 (M.D.N.C. Dec. 28, 2001) (the "Opinion"). Media General has appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291. As explained below, we affirm.

---

[1]It appears that Piedmont Publishing Company, Inc. ("Piedmont"), a subsidiary of Media General, was the actual signatory to the Agreement. Accordingly, the Union originally named Piedmont as the defendant in this action. In responding to the complaint, however, Media General insisted that Media General Operations, Inc. d/b/a *Winston-Salem Journal* — not Piedmont — was the proper defendant. And it is Media General that has appealed the district court's summary judgment award. Therefore, for the purposes of this decision, we refer to Media General as the entity bound by the Agreement.

I.

The Union is the local affiliate of the Communication Workers of America ("CWA"), and it is the bargaining representative of all full-time mailers employed by the *Journal*. Media General both publishes the *Journal* and prints and distributes other publications at the *Journal*'s Packaging and Distribution Department (the "Mailroom") in Winston-Salem.

In 1997, the Union negotiated the Agreement with Media General.[2] The Agreement, which took effect on August 31, 1997, and expired on August 12, 2000, contains provisions covering various terms and conditions of employment. It also includes a broad grievance and arbitration clause, which provides:

> *Section 18, Joint Standing Committee* . . . In the event that differences arise that cannot be settled [informally], then such disputes shall be submitted in writing within twenty (20) days of the incident to a Joint Standing Committee composed of two representatives of the Company and two from the Union. . . . To the Joint Standing Committee shall be referred all controversies growing out of the discharge of a member of the Bargaining Unit, all questions which may arise as to the construction to be placed on any of the clauses or any part of this Agreement, or any alleged violation thereof.

Between January and August of 2000, Media General refused to arbitrate four grievances filed by the Union pursuant to Section 18 of the Agreement.

A.  The PDS Grievance

On January 12, 2000, the Union filed a grievance charging Media General had assigned bargaining-unit work to non-bargaining-unit employees. In particular, the Union alleged that Media General had breached the Agreement by assigning mailing and labeling work —

---

[2]The CWA is not party to the Agreement.

specifically, for the "Millennium Special," "K-12," and "Prime-Time" mailings — to Piedmont Delivery Service ("PDS"), a Media General subsidiary that labels and distributes advertising materials for various businesses, including Media General. The employees of PDS are not represented by the Union.

The "Millennium Special" consisted of the December 31, 1999, and the January 1, 2000, editions of the *Journal*. These editions were not "live" editions, i.e., they were not sold on the calendar date of their printing. Instead, they were publications sold in the beginning of January 2000 to capitalize on the market for millennium memorabilia. "K-1" and "Prime-Time" are specialty publications printed by Media General on its presses in Winston-Salem, stacked on pallets by its Mailroom employees, and then trucked to PDS for labeling and distribution by PDS employees. Although the Union was aware of this labeling and distribution system when the Agreement was negotiated, the Union never objected to it.

Media General responded to the PDS grievance by insisting that it was not timely filed and that, in any event, it was not subject to arbitration because the Agreement, in a provision called the Letter of Understanding, specifically allowed Media General to assign work to PDS employees, other than work related to "live" editions of the *Journal*. Accordingly, Media General refused to arbitrate the PDS grievance.

## B. The Karen Clark Grievance

On May 26, 2000, the Union filed a grievance challenging Media General's discipline of employee Karen Clark. It charged that Media General had violated established past practice with respect to disciplinary procedures when it failed to inform either Ms. Clark or a Union representative of the nature of a disciplinary meeting and of Ms. Clark's right to have a Union representative present during that meeting.[3]

---

[3]Media General notes that, on January 24, 2000, it issued a memorandum to put the Union on notice that employees would be entitled to union representation in meetings with management only to the extent required by *NLRB v. J. Weingarten, Inc.*, 420 U.S. 257 (1975). Under *Weingarten*, an employer may not deny an employee's request for union representation at an investigatory interview. The Union did not grieve this memorandum, nor did it file any proceeding with the NLRB.

In 1999, Ms. Clark was fired by Media General for absenteeism. The Union grieved the discharge, and an arbitrator ordered her reinstated. On May 10, 2000, shortly after Ms. Clark's return to work, her supervisor, Kevin Garris, called her to his office and gave her a letter of disciplinary warning about her attendance record. It was this disciplinary meeting that the Union grieved on May 26, 2000. Media General responded to the Clark grievance by indicating that it would be willing to arbitrate the substance of its disciplinary action against Ms. Clark, but it refused to arbitrate the dispute over disciplinary procedure, asserting that the rights of employees to representation at such disciplinary proceedings derives from the National Labor Relations Act, not from the Agreement.

### C.   The June *Que Pasa* Grievance

On June 28, 2000, the Union filed a grievance claiming that Media General violated the Agreement when, on June 21, 2000, it had used non-bargaining-unit employees to perform bargaining-unit work on company property. Specifically, the work involved labeling, placing inserts in, and the mailing of an edition of the *Que Pasa* newspaper, an independently-owned Spanish language publication printed by Media General on a contract basis. *Que Pasa* wanted to add an insert to the June 21, 2000, edition of its paper, and it asked Media General to allow it to use its own employees to place those inserts into *Que Pasa* on Media General property (outside of the Mailroom) in Winston-Salem. Media General maintains that it agreed, "[a]s a courtesy to a valued customer."

Media General responded to the June *Que Pasa* grievance on July 10, 2000, contending that the grievance was not substantively arbitrable; however, Media General this time offered to meet with the Union to discuss the matter further. The Union asserts that, in this meeting, Media General agreed to arbitrate the grievance, but that it later reneged. Media General maintains that it refused to arbitrate because the Agreement contains no provision compelling arbitration of work assignments that *Que Pasa* gives to its own employees.

### D.   The August *Que Pasa* Grievance

On August 12, 2000, the Union filed a new grievance, charging that Media General had violated the Agreement when, on August 2,

2000, it had again used non-bargaining-unit employees to stack, place inserts in, and mail an edition of the *Que Pasa* newspaper, after the paper had been printed on Media General presses. By letter of August 26, 2000, Media General denied the claims made in the August *Que Pasa* grievance and refused to arbitrate it.

Following Media General's refusal to arbitrate the four grievances, the Union sought the assistance of the CWA in its effort to compel arbitration.

## II.

On August 8, 2000, the Union filed this action against Media General in the Middle District of North Carolina, pursuant to § 301 of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 185. In its complaint, the Union sought to compel Media General to arbitrate the PDS grievance. On September 7, 2000, the complaint was amended to add three additional claims for relief in order to compel arbitration of the Clark grievance, the June *Que Pasa* grievance, and the August *Que Pasa* grievance. Although the Union had sought help from its international affiliate to compel arbitration of the grievances, it had not expressly authorized the filing of the Amended Complaint, which the CWA filed on behalf of the Union. The Union adopted the Amended Complaint, however, and the district court awarded summary judgment to the Union on all four of its claims. Opinion at 1. Media General timely noticed this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## III.

We review de novo a district court's award of summary judgment. *See Taylor v. McDuffie*, 155 F.3d 479, 482 (4th Cir. 1998). Summary judgment is appropriate when, taking the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## IV.

The first issue raised on appeal by Media General is whether the district court erred in awarding relief on the Second, Third, and

Fourth claims for relief because the CWA had filed the Amended Complaint without the prior authorization of the Union. According to Media General, "[i]t is axiomatic that only a party to a CBA can compel arbitration pursuant to the CBA's arbitration clause." Because the CWA was not a party to the Agreement, says Media General, the CWA cannot compel arbitration. The district court concluded that, because the Union was the sole plaintiff, it properly sought to compel arbitration by adopting the Amended Complaint. Opinion at 8-13.

The Union had delegated authority to the CWA to act on its behalf in deciding how to resolve the disputes over arbitration. Significantly, Media General has cited no authority to support its contention that a court can look behind a complaint to assess who may have *really* instigated the lawsuit, or who may have provided the legal resources to file an amended complaint. Our precedents, in fact, suggest a contrary rule. *Parks v. Int'l Bhd. of Elec. Workers*, 314 F.2d 886, 906 (4th Cir. 1963) ("[I]t does not lie within the authority of a court to give effect to its general preferences between international power and local autonomy in matters of collective bargaining."). It is clear that a local union is entitled to delegate authority to an international union to act on its behalf. *See United Elec., Radio & Mach. Workers of Am. v. NLRB*, 986 F.2d 70, 75 (4th Cir. 1993) (noting that international union can aid local union during collective bargaining process); *see also Advanced Constr. Servs., Inc. v. NLRB*, 247 F.3d 807, 812 (8th Cir. 2001) (noting that a union "may delegate bargaining authority to whomever it wants") (internal quotations omitted). We are thus unable to conclude that the district court erred in ruling that the Amended Complaint was properly filed.

V.

In considering the issues of arbitrability raised by Media General, it is important to keep in mind that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). However, it is also "well settled law that federal policy favors arbitration of labor disputes, and that a presumption of arbitrability is to be applied in cases of ambiguity or doubt." *Lynchburg Foundry Co. v. Pattern-makers League of N. Am.*, 597 F.2d 384, 386 (4th Cir. 1979) (internal

quotations omitted). In deciding issues of arbitrability, we will not address the merits of the underlying claim, even if that claim appears to be frivolous. *AT&T Techs., Inc. v. CWA*, 475 U.S. 643, 649-50 (1986). Furthermore, we leave all questions concerning the scope of an arbitration agreement to the arbitrator, "unless it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 650 (internal quotations omitted).

## A.

Media General contends that the PDS grievance is not substantively arbitrable because PDS employees handled work outside the scope of the Agreement. According to Media General, PDS employees handled only special publications rather than "live" editions of the *Journal*, and the Agreement contains a specific provision, called the Letter of Understanding, that allows Media General to assign distribution work to PDS employees. The Union responds that the PDS grievance falls within the scope of the Agreement because Media General assigned bargaining-unit work to non-bargaining-unit employees.

The district court concluded that any dispute about whether the Agreement applies to special publications should be submitted to arbitration. Opinion at 17-18. Further, the court decided that any questions on the interpretation of the Letter of Understanding between the Union and Media General, regarding the assignment of work to PDS employees, should be decided by the arbitrator. *Id.* at 18-19.

The district court was correct in ruling that any dispute over the interpretation of the Agreement should be submitted to arbitration. In the *Steelworkers Trilogy*,[4] the Supreme Court made clear that doubts as to arbitrability should be resolved in favor of arbitration and that ambiguities about the scope of a collective bargaining agreement should be left to an arbitrator. As the Court stated:

---

[4]The *Steelworkers Trilogy* is comprised of the following three Supreme Court decisions: *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960); *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); and *Steelworkers v. American Manufacturing Co.*, 363 U.S. 564 (1960).

> The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator.

*Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564, 567-68 (1960). It is for the arbitrator to decide whether the Letter of Understanding entitles Media General to assign mailing and labeling work to PDS employees. Furthermore, it is unclear whether the Agreement covers all of Media General's publications, or whether it applies only to "live" editions of the *Journal*. We agree with the district court that these questions should be submitted to arbitration.

### B.

Media General next contends that the Clark grievance is not substantively arbitrable because it is premised, not on the terms of the Agreement, but rather on rights guaranteed by § 301 of the LMRA.[5] The Union responds that Media General's past practices form an implicit part of the Agreement, and that it is the Agreement, rather than the Labor Management Relations Act, that provides the foundation for the Clark grievance. The court concluded that it could be argued that past practices formed an implicit part of the Agreement, and it decided on this basis that the Clark grievance should also be submitted to arbitration. Opinion at 20-21.

The Clark grievance is premised on Media General's past practices, and it is therefore substantively arbitrable. An employer's past practices can rise to the level of an implied term of a collective bargaining agreement. *See Bonnell/Tredegar Indus., Inc. v. NLRB*, 46 F.3d 339,

---

[5]Media General also asserts that the Union failed to exhaust its administrative remedies in seeking resolution of the Clark grievance. It bases this contention on the fact that the Union never asked for a Joint Standing Committee meeting or for arbitration. However, questions of procedural arbitrability are matters for arbitrators rather than the courts. *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964).

344 (4th Cir. 1995) ("An employer's established past practices can become an implied term of a collective bargaining agreement."). In most situations, courts look to past practices to fill gaps in a collective bargaining agreement or to interpret the express terms of such an agreement. *See, e.g.*, *CSX Transp., Inc. v. United Transp. Union*, 29 F.3d 931, 936 (4th Cir. 1994) ("If the parties' written agreement is ambiguous or silent regarding the parties' intent, the arbitrator may use past practices and bargaining history to fill the gap in the written contract.") (internal quotations omitted). Here, the Agreement does not expressly address the rights of bargaining-unit members in disciplinary proceedings, so the issue is not simply whether past practices can be used as interpretive tools. The Union alleges that past practices provide an independent source of substantive rights. Nevertheless, the issue remains one of contract interpretation, which is properly left to the arbitrator. *Raysbestos-Manhattan, Inc. v. Amalgamated Clothing & Textile Workers Int'l Union*, 545 F. Supp. 387, 390-94 (D.S.C. 1982) (recognizing that arbitrator may decide whether past practice was an implicit part of collective bargaining agreement); *cf. Consol. Rail Corp. v. Ry. Labor Executives Ass'n*, 491 U.S. 299, 316-17 (1989) (suggesting that arbitrator could interpret implied terms of a collective bargaining agreement).

## C.

Lastly, Media General contends that the *Que Pasa* grievances are not substantively arbitrable because they involve work related to an independent publication. According to Media General, the Agreement does not entitle bargaining-unit employees to work that *Que Pasa* assigns to its own employees. The Union, by contrast, insists that the *Que Pasa* grievances are arbitrable for the same reasons that make the PDS grievance arbitrable.[6] According to the Union, Media General allowed non-bargaining-unit employees to perform bargaining-unit work. The district court decided that the terms of the Agreement do not clearly differentiate between Media General publications and

---

[6]As to the August *Que Pasa* grievance, Media General asserts that the Union failed to exhaust its administrative remedies, since the Union neither grieved the issue nor requested arbitration. However, arbitrators decide questions of procedural arbitrability. *John Wiley & Sons*, 376 U.S. at 557.

independent publications, that the *Que Pasa* work was arguably reserved to the bargaining unit, and that the *Que Pasa* grievances were substantively arbitrable. Opinion at 25-26.

Like the PDS grievance, the *Que Pasa* grievances involve questions of contract interpretation, and they should be submitted to arbitration. It is for an arbitrator to decide whether the Agreement applies only to work associated with the *Journal*, or whether it also encompasses work relating to independent publications handled by Media General. Indeed, § 2 of the Agreement includes broad language that appears to draw no distinction among publications. In fact, the Agreement states that it applies to "work as performed on the premises of the Company . . . [including] inserting or dispatching of papers." Because the work involving *Que Pasa* was "work as performed on the premises of the Company," the Union has a colorable claim that the Agreement obligated Media General to give this work to bargaining-unit employees. The district court, therefore, did not err in deciding that this question should be submitted to arbitration.

## VI.

For the foregoing reasons, we affirm the district court's decision compelling Media General to arbitrate the Union's grievances.

*AFFIRMED*